116

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - - -X
3   JIAN HUI LIN, a/k/a Danny    : 17-CV-3435 (WFK)
    Lin, on behalf of himself    :
4   and others similarly         :
    situated,                    :
5                                :
            Plaintiffs,          :
6                                :
            -against-            :
7                                :
JOE JAPANESE BUFFET              :
8   RESTAURANT INC., d/b/a Fuji  :
    Japanese Cuisine, FUJI       :
9   JAPANESE CUISINE INC., d/b/a :
    Fuji Japanese Cuisine, ROKA  :
10  JAPANESE FOOD INC., d/b/a    :
    Tomo Japanese Cuisine        :
11  (Elmhurst), TOMO JAPANESE    : United States Courthouse
    CAFÉ INC., d/b/a Tomo        : Brooklyn, New York
12  Japanese Cuisine (Elmhurst), :
    CHERRY BLOSSOM BUFFET INC.,  :
13  d/b/a Tomo Japanese Cuisine  :
    (Jackson Heights), SUNRISE   :
14  JAPANESE FOOD INC., d/b/a    :
    Tomo Japanese Cuisine        :
15  (Jackson Heights), TOMO      :
    JAPANESE CUISINE INC., d/b/a :
16  Tomo Japanese Cuisine        :
    (Jackson Heights), DIAN CAI  :
17  ZHOU, a/k/a Dian Chi Zhou,   :
    a/k/a Larry Zhou, ZHAO LIN   :
18  CHEN, "JOHN DOE," HUICHA LI, :
    YOUNG PU LIU, FENG QING LI,  :
19  MEI LIN, and XIN LI,         :
                                 : Tuesday, July 20, 2021
20          Defendants.          : 10:00 a.m.
- - - - - - - - - - - - - - - -X
21

22

           TRANSCRIPT OF CIVIL CAUSE FOR BENCH TRIAL
23         BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
                   UNITED STATES DISTRICT JUDGE
24

25

Proceedings                                                    117

1              A P P E A R A N C E S:

2  For the Plaintiffs:        TROY LAW, PLLC.
                              41-25 KISSENA BOULEVARD
3                             SUITE 103
                              FLUSHING, NEW YORK 11355
4                             BY:  AARON SCHWEITZER, ESQ.

5

6  For the Defendants:        LAW OFFICE OF RICARDO MOREL
                              39-15 Main Street
7                             Suite 318
                              Flushing, New York 11354
8                             New York, New York 10007
                              BY:  RICARDO R. MOREL, ESQ.
9

10

11  Court Reporter:           DAVID R. ROY, RPR
                              225 Cadman Plaza East
12                            Brooklyn, New York 11201
                              drroyofcr@gmail.com
13

14  Proceedings recorded by Stenographic machine shorthand,
    transcript produced by Computer-Assisted Transcription.

15

          P  R  O  C  E  E  D  I  N  G  S
16
                       --oo0oo--
17

18          (In open court.)

19          THE COURTROOM DEPUTY:  All rise.

20          Civil cause for a bench trial,

21  Docket Number 17-CV-03435, Lin versus Joe Japanese

22  Buffet Restaurant, Inc. et al.

23          Would each Counsel please identify themselves and

24  state the names of their respective clients for the record,

25  beginning with the plaintiff.

Proceedings                                      118

1        MR. SCHWEITZER:  Good afternoon, Your Honor.

2    Aaron Schweitzer for the Plaintiffs Jian Hui Lin, also known

3    as Danny; and Jia Chen, also known an Maggie; and Ya Jia

4    Chen, also known Alin; and Ying Chen, also known as Joyce.

5        THE COURT:  Good afternoon.  You may be seated;

6    and all, you may be seated as well.  Thank you.

7        MR. MOREL:  Good afternoon, Your Honor.

8    Ricardo Morel appearing for Defendants Joe Japanese Buffet

9    Restaurant, Inc.; Roka Japanese Food, Inc., and its

10   respective owners Zhao Lin Chen and Mei Lin and Mr. Dian Cai

11   Zhou, also known as Larry Zhou.

12       THE COURT:  Good afternoon.  Please be seated.

13       I appreciate your patience.  As you may have

14   noticed, I have entered a number of orders in this case,

15   including the pretrial order and an order reflecting my

16   rulings of yesterday, and I do appreciate your patience.

17       All right.  Would you call your next witness,

18   please.

19       MR. SCHWEITZER:  Jian Hui Lin.

20       THE COURT:  Please come forward.

21       Are you fully vaccinated, sir?

22       THE INTERPRETER:  (No response.)

23       THE COURT:  No?

24       THE INTERPRETER:  Me?

25       THE COURT:  Yes.

1          THE INTERPRETER:  Yes.  Yes, Your Honor.

2          THE COURT:  You are?

3          THE INTERPRETER:  Yes.

4          THE COURT:  Okay.  Great.

5          All right.  You are the interpreter?

6          THE INTERPRETER:  Yes.

7          THE COURT:  And you are fully vaccinated?

8          THE INTERPRETER:  Yes, Your Honor.

9          THE COURT:  That means you can take off your

10    mask --

11         THE INTERPRETER:  Oh, okay.

12         THE COURT:  -- under our rules.

13         Are you are fully vaccinated, sir?

14         THE WITNESS:  No --

15         THE COURT:  All right.  Then you have to keep --

16         THE WITNESS:  -- I only have one shot.

17         THE COURT:  All right.  Then you have to keep your

18    mask on.

19         Okay.  But you, sir, you can take off your mask

20    under our rules.

21         Anyone who is fully vaccinated under the

22    Eastern District rules may remove their mask in the well.

23    So you can do that and -- if you are fully vaccinated.  All

24    right?

25         Okay.  Now we are going to swear in -- we have a

1   new interpreter, so we have to administer the oath to the

2   interpreter.  My courtroom deputy will give you the oath

3   now.

4               THE COURTROOM DEPUTY:  Please raise your right

5   hand.

6               Do you solely swear or affirm that you will

7   justly, truly, fairly, and impartially act as an interpreter

8   in the case now before the Court?

9               THE INTERPRETER:  Yes.

10              (Interpreter sworn.)

11              THE COURT:  Please state your name for the record.

12              THE INTERPRETER:  Arthur Kwok, K-W-O-K.

13              THE COURTROOM DEPUTY:  Thank you, Mr. Kwok.

14              THE COURT:  Thank you, sir.

15              And are you going to stand there and interpret

16  from there as opposed to interpreting from a sitting-down

17  position; is that what you're going do?

18              It might be better for the court reporter, if you

19  do not mind, if you can hear -- no, he has got the mask on,

20  so maybe you should stay there and just keep your voice up.

21  Okay?

22              THE INTERPRETER:  Okay.  No problem.

23              THE COURT:  All right.  So we will see how it

24  goes.

25              THE INTERPRETER:  Okay.

```
                         Proceedings                    121
```

 1            THE COURT:  All right.  You may be seated.

 2            Please administer the oath.

 3            THE INTERPRETER:  Okay.

 4            THE COURTROOM DEPUTY:  Please raise your right

 5   hand.

 6            Do you solely swear or affirm that the answers and

 7   the testimony that you are about to give for the Court will

 8   be the truth, the whole truth, and nothing but the truth?

 9            THE WITNESS:  Yes.

10   **J I A N   H U I   "D A N N Y"   L I N,**

11            called as a witness having been first duly

12            sworn/affirmed, was examined and testified as

13            follows through the interpreter Arthur Kwok:

14            THE COURTROOM DEPUTY:  Please state your name for

15   the record.

16            THE WITNESS:  Jian Hui Lin.

17            THE COURTROOM DEPUTY:  Thank you.

18            THE COURT:  Now, what I am going to suggest is

19   that you, Mr. Interpreter, pull the microphone to you,

20   because you are the one that -- you need to hear the witness

21   and interpret, but we need to hear you for the record --

22            THE INTERPRETER:  Yes, Your Honor.

23            THE COURT:  -- okay?

24            THE INTERPRETER:  Yes.

25            THE COURT:  All right.

1           Counsel, you may proceed.

2           MR. SCHWEITZER:  Thank you, Your Honor.

3    DIRECT EXAMINATION

4    BY MR. SCHWEITZER:

5    Q    Good afternoon, Mr. Lin.

6    A    Good afternoon.

7    Q    Are you familiar with a restaurant called Fuji at

8    113-27 Queens Boulevard?

9    A    Yes, I'm familiar.

10   Q    How are you familiar with it?

11   A    I used to work there.

12   Q    In what capacity?

13   A    I made sushi over there.

14   Q    You were a sushi chef?

15   A    Yes.

16   Q    When did your employment at Fuji begin?

17   A    From April 20th, 2014 until May 14th, 2017.

18   Q    And how did your employment begin; that is, how were

19   you hired?

20   A    A friend referred me over there.

21   Q    Who is the friend?

22   A    Someone who used to work at Tomo.

23   Q    What's Tomo are you referring to?

24   A    That would be a restaurant -- the first restaurant of

25   the big boss.

1    Q    When you say, "the big boss" to whom are you referring?

2    A    The person wearing blue.

3    Q    So that would be Larry Zhou?

4    A    Correct.

5            MR. MOREL:  Objection.  That's leading,

6    Your Honor.

7            THE COURT:  Do you see the person that you are

8    referring to in the courtroom?

9            THE WITNESS:  Yes.

10           THE COURT:  Can you point him out and point to an

11   article of clothing that he is wearing?

12           THE WITNESS:  Wearing blue, sitting in the third

13   position from the left.

14           THE COURT:  The record will reflect that the

15   witness has correctly and accurately identified the

16   individual that he has named.

17           The objection is overruled.  You may continue,

18   Mr. Schweitzer.

19   BY MR. SCHWEITZER:

20   Q    When did your friend used to work at Tomo?

21   A    Well, I suppose before me.

22   Q    Before April 2014?

23   A    Yes.

24   Q    And to your knowledge where was the Tomo that you've

25   been referring to located?

 1   A    Queens Boulevard, across the street from the

 2   Queens Mall.

 3   Q    Would that 89-1 --

 4            THE COURT:  Counsel, you really have to keep your

 5   mic on.

 6   Q    Is that 89-14 --

 7            THE COURT:  Counsel, you have to turn your

 8   microphone on.

 9            (Pause in proceedings.)

10            THE COURT:  Ms. Love, would you assist Counsel,

11   please, in turning on his microphone?

12            (Pause in proceedings.)

13            THE COURT:  Thank you, Ms. Love.

14            Please continue, Counsel.

15            MR. SCHWEITZER:  Your Honor, I'm pretty sure the

16   microphone is not yet on.  It was on previously.  It seems

17   to have been turned off somehow.

18            (Pause in proceedings.)

19            THE COURT:  Continue, please.

20            MR. SCHWEITZER:  Yes, Your Honor.  Thank you.

21   BY MR. SCHWEITZER:

22   Q    The Tomo Restaurant you're referring to as being across

23   the street from the Queens Mall, is that at

24   89-14 Queens Boulevard?

25            MR. MOREL:  Objection.  Leading.

1          THE COURT:  Overruled.

2     A    Located on Queens Boulevard across from the

3     Queens Mall.

4     BY MR. SCHWEITZER:

5     Q    Okay.  Did you ever perform work at Tomo or any other

6     restaurant owned by Mr. Zhou?

7     A    Only at Fuji, I only worked at Fuji.

8     Q    All right.  And once you were referred to work by your

9     friend to work at Fuji, how were you hired?

10    A    Phone calls.

11    Q    With whom?

12    A    I called my friend, and my friend told me to go to

13    Fuji.

14    Q    Then what happened?

15    A    And then I went to work that day.

16    Q    Did you have an interview?

17    A    No.

18    Q    When and how did you learn what your schedule would be

19    at Fuji?

20    A    Well, as I went in, I just followed what they told me

21    in terms of what my schedule would be, and I would just come

22    and go based on that.

23    Q    Who told you?

24    A    A chef or *su fu* that worked in there, and I also looked

25    at the menu myself.

1  Q    So you found out your schedule from a co-worker and

2  from the operating-hours cook?

3  A    Yes, correct.

4  Q    How did you know how many days per week you were to

5  work?

6  A    They told me that also.

7  Q    Who is "they"?

8  A    Those chefs that worked inside or in there.

9         MR. MOREL:  Objection, that's hearsay.

10        THE COURT:  Overruled.

11  BY MR. SCHWEITZER:

12  Q    Are you referring to the kitchen chef of sushi chef or

13  some other kind of chef?

14  A    I meant sushi chefs.

15  Q    And what schedule did you end up working at Fuji?

16  A    I worked six days a week, Monday off.

17  Q    And what were your hours on those six days that you

18  worked?

19  A    Tuesday through Thursday, 11:30 to 11:00 p.m.; Friday,

20  Saturday, 11:30 until 12:00; Sunday, 12:00 to 11:00 p.m.

21  Q    Now, you said that schedule was based on the operating

22  hours.  Did you ever have to arrive before the operating

23  hours and stay late?

24  A    Yes.

25  Q    Under what sort of circumstances?

1  A    Well, almost late -- almost late getting off all the

2  time, because I had to wait for that person to finish; to

3  wait for him, meaning I have to wait until the boss, so that

4  everybody leave together.

5  Q    When you say "the boss," to whom are you referring?

6  A    Someone else named Zhao Lin Chen.

7  Q    Do you see Mr. Zhao Lin Chen in the courtroom today?

8  A    Yes.

9  Q    Can you point him out?

10  A    Second person wearing black.

11  Q    When you say, "second person," you're referring to

12  people at the defense table?

13  A    Yes, next to the attorney.

14  Q    And approximately how late beyond your scheduled hours

15  would you have to stay?

16        THE COURT:  The record will reflect that the

17  witness has properly identified and accurately identified

18  the person.

19        Go on, Counsel.

20  Q    Approximately how late after your scheduled hours would

21  you have to stay?

22  A    Well, basically, I start working until I finished work.

23  Q    Now, you said that your leaving time was typically

24  what's scheduled to be 11 o'clock Tuesdays, Thursdays, and

25  Sundays; and 12 o'clock on Fridays and Saturdays.  You also

1    said that you would typically have to leave later than your

2    scheduled working time.  About how much later?

3    A    Late by 10, 20 minutes.

4    Q    Did you have any breaks during the working day?

5    A    Sometimes I did; some other times, no.

6    Q    When you had breaks, how long would they be?

7    A    About one hour.

8    Q    And how many one-hour breaks would you get on a typical

9    day?

10   A    One, only one hour.

11   Q    Was your break ever interrupted so that you would have

12   to go back to work before the hour was finished?

13   A    Sometimes, yes.

14   Q    Under what sort of circumstances?

15   A    When it was busy.

16   Q    And who, if anyone, would tell you to cut your break

17   short?

18   A    That would be Chen Zhao Lin.

19   Q    Did you have any other breaks during the working day

20   besides the single supposed-to-be-one-hour break?

21   A    No, no other.

22   Q    Were you provided the meals to eat at Fuji?

23   A    Yes.

24   Q    What meals were you provided?

25   A    Lunch and dinner.

1  Q    Approximately how long did it take you to eat lunch?

2  A    Approximately, five, ten minutes.

3  Q    And about how long did it take you to eat dinner?

4  A    Same thing.

5  Q    All right.

6         Was there a method of recording your arrival time,

7  your break time, and your departure time from work at Fuji?

8  A    No.

9  Q    Did your work schedule at Fuji ever change?

10  A    No.

11  Q    What was your starting salary?

12  A    Initially 700 per week.

13  Q    How did you learn that that would be your starting

14  salary?

15  A    They told me, they said 700 per week.

16  Q    Who is "they"?

17  A    The friend that I had the phone conversation with.

18         MR. MOREL:  Judge, that's hearsay.

19         THE COURT:  Overruled.

20  BY MR. SCHWEITZER:

21  Q    To your knowledge how did your friend who worked at

22  Tomo know what your salary would be at Fuji?

23  A    He directly asked Chen Zhao Lin.

24  Q    And over the course of your employment, did your salary

25  change?

1   A    Yes.

2   Q    I'm showing you what was previously entering into

3   evidence as Plaintiffs' Exhibit 3.

4           (Plaintiffs' Exhibit Number 3 is published in open

5   court.)

6   Q    Can you see it on your screen?

7   A    Yes.

8   Q    Does your name appear on this document?

9   A    Yes.

10  Q    Where does it appear?

11  A    The first line.

12  Q    Where it says Danny?

13  A    Yes.

14  Q    And this document purports to show that you were paid

15  $750 a week ending January 3, 2015; is that accurate?

16  A    Should be correct, because I remember 2014 I was still

17  700.

18  Q    And your salary rose to 750 in 2015?

19  A    Yes.

20  Q    I'm now showing you the first page of Exhibit 4 --

21          (Plaintiffs' Exhibit Number 4 is published in open

22  court.)

23  Q    -- which purports to show that you were paid $750 for

24  the week ending February 7th in 2016; is that accurate?

25  A    Where?  I don't see my name.

1    Q    Oh, I'm sorry.

2         Is that better?

3    A    Yes.

4         MR. SCHWEITZER:  For the record, part of the top

5    of the document was cut off by the Elmo.

6    Q    So is the $750 weekly salary for that week accurate?

7    A    Accurate.

8    Q    And I'm now showing you the first page of

9    Plaintiffs' Exhibit 5 --

10        (Plaintiffs' Exhibit Number 5 is published in open

11   court.)

12   Q    -- which purports to show that you were paid $775 for

13   the week ending January 22, 2017; is that accurate?

14   A    Correct.

15   Q    And how did you learn about these changes to your

16   salary?

17   A    He -- he told me.

18   Q    Please use the names rather than pronouns if you can

19   going forward.  It makes things easier.

20   A    Okay.

21   Q    Okay.  So when you said "he told me," who are you

22   referring to?

23   A    Zhao Lin Chen.

24   Q    When you were hired, did anybody give you a piece of

25   paper telling you how much you would be paid?

1   A   No.

2   Q   How were you paid, by cash, by check, by direct

3   deposit, some other way?

4   A   Cash.

5   Q   And who gave you your cash?

6   A   Zhao Lin Chen.

7   Q   And did anybody else ever pay you your regular salary

8   at Fuji?

9   A   Anybody else?  No.

10  Q   Did anybody ever tell you that your 700- or 750- or

11  $775-weekly salary was based on an hourly rate?

12  A   No, no.

13  Q   Did anybody at Fuji ever tell you that you were being

14  compensated for a particular number of hours?

15  A   No, no.

16  Q   To your knowledge did Fuji take any credits against

17  your wage?

18  A   Well, one time I was late two hours, and they deducted

19  half a day from me.

20  Q   What is half a day's pay -- or what was half a day's

21  pay at the time?

22  A   I think about 60, 70 was deducted.

23  Q   When you were paid, did you receive any other piece of

24  paper besides your pay?

25  A   No.

1   Q    When you were paid, did you have to sign any piece of

2   paper or pay receipt that was retained by the boss?

3   A    Yes.  That would be the salary receipt that I just saw.

4   Q    You're referring to a document in the form of Exhibits

5   3 through 5?

6   A    Yes.

7   Q    Does your signature appear on this document?

8   A    Yes.

9   Q    Okay.

10   A    Yes, it's on it.

11   Q    Where?

12   A    First line.

13   Q    Where in this first line does your signature appear?

14   A    I actually -- I actually didn't sign.  He wrote it.

15   Q    Okay.  Just I think there may have been a translation

16   snafu.  Just please pay attention to what the question being

17   asked.

18          Did you actually sign this document or any

19   document in a form like this?

20   A    Oh, this one?  I did not.  He wrote this.

21   Q    Okay.  And --

22   A    Yes, he wrote this.

23   Q    And when you say "he," are you referring to Boss Chen?

24   A    Chen Zhao Lin.

25   Q    Uh-huh.  And did he write your name and the salary

1  amount in front of you?

2  A    No.

3  Q    How do you know he wrote it?

4  A    Well, because he showed it to me and he asked me to

5  sign.

6  Q    Did you sign?

7  A    Not this one.

8  Q    Okay.

9        I'm going to flip through the exhibit, and you let

10  me know if your signature appears on any of these pages.

11        THE COURT:  And by the exhibit, you are referring

12  to Plaintiffs' Exhibit 3, right, Counsel?

13        MR. SCHWEITZER:  Yes, Your Honor.

14  A    Right here in the back page or this page, the later

15  page, I signed this over here (indicating).

16        MR. SCHWEITZER:  And for the record, this page

17  appears to be referring to the weeks ending March 1 and

18  March 8.

19  Q    The week of March 1, does your signature appear next to

20  the line saying Danny?

21  A    Yes.

22  Q    And how about on the week ending in March 8th, does

23  your signature appear there?

24  A    Yes.

25  Q    Next page, week ending March 15 and 22, does your

1    signature appear on each of those weeks?

2    A    I signed, yes.

3    Q    Next page, weeks ending May 3 and May 10, does your

4    signature appear there?

5    A    Yes.

6    Q    Next page, week ending May 17, does your signature

7    appear there?

8    A    Yes.

9    Q    Next page, week ending May 24, does your signature

10   appear there?

11   A    Yes.

12   Q    Next page, week ending May 31, does your signature

13   appear there?

14   A    Yes.

15   Q    Next page, weeks ending July 5 and July 12, does your

16   signature appear there?

17   A    Yes, yes.

18   Q    Next page, week of July 19, does your signature appear

19   there?

20   A    That one no, no.

21   Q    Okay.

22         A few pages on, week ending October 4, 2015, does

23   your signature appear there?

24   A    Yes.

25   Q    Next page, week ending October 11, does your signature

1  appear there?

2  A    Yes.

3  Q    Next page, week ending October 18, does your signature

4  appear there?

5  A    Yes.

6  Q    Next page, week ending October 25, does your signature

7  appear there?

8  A    Yes.

9  Q    You mentioned that you only worked for Fuji and did not

10  work for Tomo.  Did the friend who worked for Tomo ever work

11  for Fuji?

12  A    No.

13  Q    To your knowledge did any of Fuji's employees go over

14  to Tomo to perform work?

15  A    No.

16  Q    To your knowledge did any of Tomo's employees go over

17  to Fuji to perform work?

18  A    Oh, yes, yes.

19  Q    Who were they?

20  A    Wait staff from Tomo and the sushi, sushi chef from

21  Tomo.

22  Q    Do you recall any of their names?

23  A    No, I don't, so long ago.

24  Q    Approximately how many wait staff from Tomo came over

25  to work at Fuji?

1   A    I would say two or three.

2   Q    Were these waiters, waitresses, or both?

3   A    They were all female waitresses.  They were waitresses.

4   Q    Did they come from Tomo to work on a regular basis or

5   on an occasioning basis?

6   A    Sometimes.

7   Q    Under what sort of circumstance?

8   A    That, I don't know.  I mean, I didn't tell them to

9   come.

10  Q    How did you know they'd come from Tomo?

11  A    Because Zhao Lin Chen said so.

12  Q    To your knowledge how did they go from Tomo to Fuji?

13          MR. MOREL:  Objection.  Relevance.

14          THE COURT:  Overruled.

15  A    They all took Zhao Lin Chen's vehicle, took a ride in

16  Zhao Lin Chen's vehicle.

17  Q    Did Zhao Lin Chen drive them to and from Tomo -- I'm

18  sorry, to and from Fuji to Tomo?

19  A    Yes.

20  Q    And to your knowledge for their work at Fuji, were they

21  paid by Fuji or were they paid by Tomo?

22  A    That, I don't know.

23  Q    To your knowledge did they collect any tips from Fuji

24  customers?

25  A    That, I don't know.

1  Q    You also mentioned a sushi chef from Tomo who worked at

2  Fuji.  Do you remember that person's name?

3  A    It was too long ago, I don't remember.

4  Q    Was the sushi chef a man or a woman?

5  A    A man.

6  Q    And how do you know he was from Tomo?

7  A    Because he said so himself.  He said he's from Tomo.

8  Q    Did he say that to you?

9  A    Yes.

10  Q    In what context?

11  A    While we were working, while we were shooting the

12  breeze.

13  Q    Did he come to work at Fuji from Tomo on a regular

14  basis or an occasional basis?

15  A    Occasionally.

16  Q    Approximately how often?

17  A    Well, two, three times.

18  Q    Over the course of your employment, he came two or

19  three times?

20  A    Yes.

21  Q    Under what sort of circumstances?

22  A    When sushi bar is short, he came over to help.

23  Q    So how did he get from Tomo to Fuji?

24  A    I don't remember, so long ago; maybe sometimes arrange

25  his own transportation and then take Zhao Lin Chen's -- Zhao

1   Lin Chen's vehicle ride back.

2   Q    And to your knowledge for his work at Fuji was he paid

3   by Fuji or was he paid by Tomo?

4   A    That, I don't know.

5   Q    Do you know whether he was paid for his work at Fuji?

6   A    I don't know.

7   Q    Did you ever observe Mr. Chen giving him money?

8   A    No.

9   Q    Did Tomo ever supply Fuji with ingredients?

10  A    Yes.

11  Q    What sort of ingredients?

12  A    Kitchen food supplies, seafood, fish, for the sushi,

13  for making the sushi.

14  Q    Did Tomo ever supply Fuji with anything else, for

15  instance, equipment?

16  A    I don't remember.

17  Q    Okay.

18       How did -- withdrawn.

19       Did Fuji ever supply Tomo with ingredients?

20  A    Yes.

21  Q    What sort of ingredients?

22  A    Same thing, fish for the sushi, kitchen food supplies.

23  Q    Approximately how often would Tomo supply Fuji with

24  ingredients?

25  A    What do you mean?  Occasion.

1   Q    Occasionally, on the order of once a week, once a

2   month, a year?

3   A    Not that often, but maybe once every month or two.

4   Q    And about how often did Fuji supply Tomo with

5   ingredients?

6   A    I don't remember exactly, but I would say about

7   approximately similar, about the same.

8   Q    And how would the ingredients get between Tomo and Fuji

9   or between Fuji and Tomo?

10  A    It was aways Zhao Lin Chen who picked it up and

11  transported it.

12  Q    So Zhao Lin Chen would bring ingredients from Tomo to

13  Fuji and bring ingredients to Fuji to Tomo?

14  A    Correct.

15  Q    Do you recognize the lady at the defense table?

16  A    She's the wife of the big boss.

17  Q    That would be Larry Zhou's wife?

18  A    Correct.

19  Q    Do you know her name?

20  A    I don't really know exactly.

21  Q    How do you know she's Larry Zhou's wife?

22  A    She would come to Fuji occasionally.

23  Q    And what would she do when she came?

24  A    I don't really know.  I mean, she would speak with Zhao

25  Lin Chen and the wait staff, or I don't really know.

1   Q    Do you know what she spoke about?

2   A    I don't know.

3   Q    And you said she would come to Fuji occasionally.

4   Approximately how often?

5   A    Maybe just two, three times a year.

6   Q    Did you ever observe Mei Lin distributing envelopes?

7   A    Yes.

8   Q    On what occasion or occasions?

9   A    Chinese New Year.

10  Q    Did she ever give you a red envelope?

11  A    Yes.

12  Q    What, if anything, was in the red envelope?

13  A    $100.

14  Q    Did Larry Zhou ever come to Fuji?

15  A    Yes.

16  Q    And what would he do when he came?

17  A    Always he looked for Chen Zhao Lin.

18  Q    And what, if anything, would he do when he found him?

19  A    They would be having a conversation.

20  Q    About what?

21  A    I don't know.

22  Q    Did Mr. Chen ever give you instructions or tasks yo do

23  in Mr. Zhou's name?

24  A    Yes, yes.

25  Q    What sort of tasks?

1  A    Was not allowed to put the tip box in front, as well as

2  telling me to kill -- kill the fish, and do various side

3  works.

4  Q    What kind of side works?

5  A    To have to do a lot of side work, anything connected

6  with the sushi, making the sushi, such as kill the fish,

7  clean the fish, cook rice.

8  Q    And you also mentioned a tip box.  To what are you

9  referring?

10  A    Well, it was supposed to be -- the tip box was supposed

11  to be in the front where the customers can put tips in

12  there, but it was not allowed.

13  Q    What do you mean there was supposed to be, but it was

14  not allowed?

15  A    Yes.  He told me that's what the big boss said.

16  Q    Mr. Chen told you?

17  A    Yes, yes.

18  Q    Did there used to be a tip box allowed and Mr. Zhao put

19  a stop to that?

20          MR. MOREL:  Objection, that's leading.

21          THE COURT:  Overruled.

22  A    Yes.

23  BY MR. SCHWEITZER:

24  Q    Was there a reason given for that change in policy?

25  A    Well, he was making sushi, too, when I first arrived,

1    so he was my partner.  But that's what he's always said, is

2    according to the boss.

3    Q    When you say, "he," are referring to Mr. Chen?

4    A    Yes, correct, uh-huh.  Yes, I meant Chen Zhao Lin, yes.

5    Q    Did the removal of the tip box coincide with the change

6    in your salary?

7    A    Not really, except for the part where there was no more

8    tips.

9    Q    Did anybody at Fuji ever tell you that you would be

10   paid less than the minimum wage because you received tips?

11   A    Well, no, no.  I -- no one told me any of that.  I

12   don't have tips.

13   Q    Did anybody tell you that your salary would include a

14   time-and-a-half premium for any hours worked over 40 in a

15   week?

16   A    No.

17           MR. SCHWEITZER:  Nothing further.

18           THE COURT:  All right.  It's 1 o'clock now.  We

19   will take our luncheon recess, and we will resume at 2:15

20   with cross-examination.

21           Do not talk with anyone about your testimony

22   during the break, sir.

23           THE WITNESS:  Okay.

24           THE COURT:  Okay.  Thank you.  We will see you at

25   2:15.

Jian Hui Lin - Direct - Schweitzer                144

1          THE COURTROOM DEPUTY:  All rise.

2          (Luncheon recess taken.)

3          (Continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            A F T E R N O O N   S E S S I O N

2            (In open court.)

3            THE CLERK:  This is the second call for docket

4    number 17-CV-03435, Lin versus Joe Japanese Buffet Restaurant,

5    et al.

6            THE COURT:  Thank you.  Counsel, you may be seated.

7            Will the witness take the stand for

8    cross-examination.

9            You are still under oath and I'm going to ask you,

10   as I ask all witnesses, did you talk with anyone about your

11   testimony during the break, sir?

12           THE WITNESS:  No.

13           THE COURT:  Thank you.  You may cross-examine,

14   Counsel.

15           MR. MOREL:  Thank you, Your Honor.

16           THE COURT:  Make sure the microphone is on, please.

17           (JIAN HUI LIN, the witness, resumed, through the

18   interpreter Arthur Kwok.)

19   CROSS-EXAMINATION

20   BY MR. MOREL:

21   Q    Good afternoon, Mr. Lin.

22   A    Hi.  How are you?

23   Q    You're known also as Danny Lin, is that correct?

24   A    Yes, that's my English name.

25   Q    And at work, what do they call you?  Do they call you

1   Danny or do they call you Jian Lin?

2   A    Danny.

3   Q    The lady sitting here at the table, what was her name,

4   did you say?

5   A    I did not mention her name.

6   Q    Oh, okay.  Now, you worked at this restaurant, Joe

7   Japanese, since July 20th -- I'm sorry, since April 20, 2014

8   to May 14, 2017.  That was your testimony?

9   A    Correct.

10  Q    And that is at 1327 Queens Boulevard, Forest Hills?

11  A    11327.

12  Q    And you mentioned a restaurant by the name of Tomo on

13  Queens Boulevard across the street from a mall, remember?

14  A    Yes.

15  Q    Did you ever work there?

16  A    No, not over there.

17  Q    Okay.  The gentleman sitting next to the young lady

18  there, do you recognize him?

19  A    I saw him a few times.

20  Q    Do you know his name?

21  A    Larry.

22  Q    How do you know his name is Larry?

23  A    Zhao Lin Chen told me that every day.

24  Q    He told you that every day?

25  A    Almost every day.

1  Q    Okay.  Do you recognize the gentleman to his right?

2  A    The person with the black clothing, correct?

3  Q    Yes, with the white shirt and the black jacket.

4  A    Yes, I know him.  I recognize him.

5  Q    Do you know his name?

6  A    Zhao Lin Chen.

7  Q    How do you know him?

8  A    Well, we're sort of partners for almost two years.

9  Q    What do you mean, you were partners?

10 A    Meaning we worked together at the sushi bar.

11 Q    As co-employees, I take it?

12 A    Something like that.

13 Q    Were you co-workers, something like that?

14 A    I suppose, yes.

15 Q    You suppose or are you sure?

16 A    Yes.

17 Q    Meaning what, that you worked at the same time at the

18 same place, is that what you mean?

19 A    Correct.

20 Q    And I take it that during that period of time that you

21 and Mr. Chen were co-workers, that you, he was not your boss,

22 right?

23 A    He is also a boss because basically he's the one that

24 told me to do almost everything.

25            MR. MOREL:  I move to strike the portion of that

1   answer that is nonresponsive.

2            THE COURT:  Overruled.

3   Q    My question is while you were co-workers, at the same

4   time that you were co-workers, was he also your boss?

5            MR. SCHWEITZER:  Asked and answered.

6            THE COURT:  Overruled.  You may answer.

7   A    Yes.  He's the one that gave me my pay.

8   Q    He gave you your pay back when you both were co-workers

9   in 2014?

10            MR. SCHWEITZER:  Lack of foundation.

11            THE COURT:  Overruled.  Answer the question.

12   A    Correct.

13   Q    So he paid you from the very beginning that you ever met

14   him, is that right?

15   A    The first two weeks was not him.  It was a different

16   boss, a different boss.

17   Q    Do you remember who that was?

18   A    No, that I don't remember.

19   Q    But you do remember that it was two weeks that somebody

20   else was your boss and then he became your boss, correct?

21   A    Yes.

22   Q    You referred to him earlier as, and I quote, "big boss,"

23   do you remember?

24            MR. SCHWEITZER:  Objection.  No, he didn't.

25            THE COURT:  Overruled.

1   A    I didn't.  I didn't say he was the big boss.

2   Q    I stand corrected.  Mr. Zhou sitting next to Mr. Chen,

3   you referred to him to the left as big boss, correct?

4   A    Yes.

5   Q    Was it just you that referred to him as "big boss" or

6   would you say that he was generally known as big boss at Fuji

7   restaurant?

8   A    Everybody, everybody calls him big boss.

9   Q    Everybody called him big boss.

10          So you also said that you remember that the

11  restaurant Tomo and the restaurant Fuji where you worked used

12  to share materials, remember your testimony?

13  A    Always it was Chen Zhao Lin who was doing the delivery

14  and the pickup back and forth.

15  Q    My question is do you recall testifying that occasionally

16  Fuji restaurant would send over materials such as food

17  materials over to Tomo, remember your testimony?

18  A    Yes, yes, I remember.

19  Q    You also testified that the opposite was also true, that

20  Tomo restaurant would occasionally send over food materials

21  over to Fuji, right?

22  A    Yes.

23  Q    Now you know this for a fact out of personal experience

24  or did somebody tell you this?

25  A    Chen Zhao Lin told me.  He said he went to pick up some

Lin - cross - Morel                                    150

1  food material.

2  Q    You also testified that waitresses, two or three

3  waitresses at a time who worked at Tomo restaurant used to go

4  and work at Fuji restaurant, right?

5  A    Yes, I remember.

6  Q    Right.  And I take it that these waitresses, you

7  testified that these waitresses worked also at Tomo at the

8  same time, right?

9  A    Yes.

10  Q    Do you know whether they worked full -- withdrawn.

11        Do you know whether they worked more hours at Fuji

12  than they did at Tomo or vice versa?

13  A    I don't know.

14  Q    Would you say that they were working at Fuji on a

15  part-time basis?

16  A    No.  No.

17  Q    No, they were not working there on a part-time basis?

18  A    It was Chen Zhao Lin who asked people from Tomo to come

19  and help out.

20  Q    That is not my question, sir.  My question is were they

21  working full time or part time at Fuji while you were working

22  there, these waitresses?

23  A    They work a day or two.  I suppose that make them

24  part-timers.

25  Q    Thank you.

1          Now, you said that you got the job at Fuji

2    restaurant through a recommendation from a friend?

3    A    Yes.

4    Q    And then you just went there and started working, right?

5    A    My friend worked at Tomo and referred me to work at Fuji.

6    Q    Now, you said there was no interview regarding your job

7    at Fuji restaurant, right?

8    A    Correct.

9    Q    You also told us that nobody ever told you the rate of

10   pay that you would be getting paid, right?

11             MR. SCHWEITZER:  Objection, mischaracterized.

12             THE COURT:  Overruled.

13   A    No one.

14   Q    You also said that nobody ever informed you of the number

15   of hours that you would be working, that you would be

16   compensated for, right?

17   A    Yes.  Yes.

18   Q    Yes, nobody told you this information, right?

19   A    They never tell me how much per hour.  They always said

20   how much per week.

21   Q    So you were told how much you were going to be paid

22   total, right, they just didn't tell you the hourly rate?  Is

23   that a fair assessment of what you're saying?

24   A    I actually don't understand the last question.

25             THE COURT:  Did they tell you how much money you

1    were going to make?

2              THE WITNESS:  Yes, per week.

3              THE COURT:  Did they ever tell you how much money

4    you were going to make per hour?

5              THE WITNESS:  No.

6              THE COURT:  So the only compensation number you were

7    given was on a per week basis, is that correct?

8              THE WITNESS:  Yes.

9              THE COURT:  Okay.  Counsel, why don't we move on.

10   I've got it.  Okay?

11   Q    Now, according to the hours that you say you that did

12   work, correct me if I'm wrong, I believe you testified that

13   you work Tuesdays, Wednesdays and Thursdays, from 11:30 a.m.

14   until 11 p.m., is that right?

15   A    Correct.

16   Q    Now, that would make it 11.5 hours per day times 3,

17   correct?

18   A    I have not made that calculation.

19   Q    You said that you worked Friday and Saturday, 11:30 a.m.

20   to 12 midnight.  Is that correct?

21   A    Yes.

22   Q    Would you agree that that's 12.5 hours times two days?

23   A    I have not made that calculation.

24   Q    Is it true you worked 34 and a half hours per week,

25   Tuesdays, Wednesdays and Thursdays?

1  A    I have not made that calculation.  In my mind, I would

2  just be working from the day and then they told me what time

3  to what time.

4  Q    You also said that you worked on Sundays from 12 p.m. to

5  11 p.m., right?

6  A    Yes.

7  Q    Would you agree that from 12 p.m. to 11 p.m. is 11 hours?

8  A    Close.  In any event, I followed -- I worked following

9  what's on the menu.

10  Q    Sir, if we add all those hours, you're telling us you

11  worked 70 hours per week at Fuji, right?

12  A    I never said that and I never made that calculation.

13  Q    Isn't it true that you actually had two hours off every

14  day that you worked?

15  A    No.

16  Q    Isn't it true that you had two half-hour breaks during

17  your shift?

18  A    No, I don't.

19  Q    You don't, what?

20  A    I do not have that much time for breaks.

21  Q    Well, is it true that besides the two half-hour breaks,

22  you had a one-hour break also?

23          MR. SCHWEITZER:  Objection.

24          THE COURT:  Overruled.

25  A    No, I do not.

1  Q    Would you agree that if you did take those two half-hour

2  breaks plus another hour break, that equals two hours?

3          MR. SCHWEITZER:  Objection.  Speculation.

4          THE COURT:  Sustained.  Sustained.  You said "if."

5  Q    Now, sir, I want to show you what I've marked as

6  Defendants' Exhibit A.

7          MR. SCHWEITZER:  I don't think that was disclosed.

8          MR. MOREL:  It's your exhibit.  I'll use yours.

9  Q    Just to make it easier, I'll show you what my colleague,

10 your counsel, has provided us as Plaintiffs' Exhibit 3.

11         THE COURT:  Is this document in evidence?

12         MR. SCHWEITZER:  It is, Your Honor.

13         THE COURT:  I was asking counsel at the podium.

14         Is this document in evidence?

15         MR. MOREL:  Yes, it is, Your Honor.

16         THE COURT:  Okay.  Go ahead.

17 Q    Do you remember your attorney asking you questions about

18 this document?

19 A    Yes.

20 Q    And that's you there where it says "Danny"?  That would

21 be referring to you, correct?

22 A    Correct name but I didn't write it.

23 Q    I didn't ask you if you wrote it.  I'm asking you

24 whether, where it says "Danny," whether that is referring to

25 you, sir?

Lin - cross - Morel                     155

1    A    I suppose yes.

2    Q    Do you remember this morning your attorney asked you

3    questions, went page by page in this document and asked you

4    about, asked you questions about this document?

5    A    Yes.

6    Q    And you acknowledged to us that where it says "Danny,"

7    that is referring to you, right, sir?

8    A    I suppose, yes.

9    Q    From your testimony, is it fair to say from your

10   testimony this morning that your salary began -- what did you

11   say, you said you started around $700 a week, is that right?

12   A    Yes.

13   Q    And you also said that it went up periodically?

14   A    Yes.

15   Q    Now, did your salary ever change during your employment?

16   Did it ever go down or did you ever get less than, say, $750?

17   A    Yes.

18   Q    It did go down sometimes?

19   A    Once.

20   Q    Once?  Do you recall when that was?

21   A    That I don't remember.  Too long ago.

22   Q    Would it refresh your recollection to look at this

23   document, page 3, the week of, I take it that's January 24th?

24        Do you see that?

25   A    Yes.

1   Q    2015.  Do you see where it says "Danny"?  You got paid

2   $625 that week, right?

3   A    Yes.

4   Q    Why would that be, do you recall?

5   A    I, I was late two hours and they docked me half a day.

6   Q    Sometimes you got paid $750 and as is the case the week

7   of May 3, 2015, you got paid $725.  Why that fluctuation from

8   750 to 725, do you recall?

9   A    Well, right now, you're showing me something with

10  signature previously.  I didn't write those and I didn't sign

11  those, the previous material that you showed me.

12  Q    So where it says 750, those are correct, right?

13  A    Well, I can only confirm and see that where I signed my

14  name, that's the, that's accurate.

15  Q    Is that your signature, sir?

16  A    It is.

17  Q    So you're confirming that you got paid $725 the week of

18  May 24, 2015, right?

19  A    Yes.

20  Q    You're also confirming that the week of May 17, 2015 and

21  that's your signature, right?  Is that your signature?

22  A    Yes.

23  Q    You're confirming that you got paid $725 that week,

24  right?

25  A    Well, those that I signed, there should be no error.  It

1   should be correct for those that I signed.

2   Q    Yes.  Now, the week of May 31st also, that's you?

3   "Danny," that's your signature, right?

4   A    Yes.

5   Q    $725, right?

6   A    Yes, everything that I signed my name after it.

7   Q    I understand.  Now, my question is without going any

8   further, it seems like you're consistently now being paid $725

9   a week, right?

10  A    Yes.

11  Q    Is that because you were consistently late or for some

12  other reason?

13  A    No, I've only been late once.

14  Q    So why did your salary go down from $750 to 725?

15  A    I only confirmed the one that I signed.

16  Q    Sir, you just told us that the ones I'm asking you about

17  do have your signatures next to it, right?

18       There's no question about their accuracy, right?

19  A    Well, the first one that you show me, I didn't write and

20  I didn't sign.

21  Q    I just showed you a number of them where you were getting

22  paid $725, right?

23  A    Well, if I didn't sign, I didn't write it.  Those that I

24  signed, I confirm.

25  Q    Would you confirm for us now that you were being paid

Lin - cross - Morel                                158

1   $750 a week prior to that, to the ones that you did sign for

2   $725?

3           THE INTERPRETER:  I'm sorry.  What's your question?

4   Q    Were you paid -- would you confirm now that to your

5   recollection, that you were paid $750 before that?

6   A    Since when?

7           THE COURT:  Counsel, let's try it this way.

8           Sometimes you got $750 a week, right, sometimes?

9           THE WITNESS:  Sometimes.

10           THE COURT:  And sometimes you got $725 a week,

11  right?

12           THE WITNESS:  That was prior to that, yes.

13           THE COURT:  Sometimes?

14           THE WITNESS:  Yes.

15           THE COURT:  Why did you sometimes get $750 and

16  sometimes get $725, if you know?

17           THE WITNESS:  Because my raise -- my pay was raised

18  from 725 to 750.

19           THE COURT:  When you started, what was your pay the

20  first time you got paid?

21           THE WITNESS:  700.

22           THE COURT:  And did it go up to 725?

23           THE WITNESS:  Yes.

24           THE COURT:  When did it go up to 725 from 700?

25           THE WITNESS:  I don't remember exactly but

1   approximately four or five months later.

2          THE COURT:  And then did it go up from 725 to 750?

3          THE WITNESS:  Yes.

4          THE COURT:  Did it ever go down from 750 to 725

5   other than the time you were fined for being late?

6          THE WITNESS:  No.  No.

7          THE COURT:  Let's move on, Counsel.  That's his

8   testimony.

9   Q    Did your salary ever go up to 775?

10  A    Yes.

11  Q    Do you recall when that was?

12  A    I don't remember exactly.

13  Q    For example, here, the year 2016, I believe this date

14  would be March, the week of March 27th.

15         THE COURT:  Counsel, we can't see it.

16         MR. MOREL:  I apologize, Your Honor.

17         THE COURT:  It's all right.

18  Q    Do you see that, the week of March 27, 2016?  That's you,

19  right?

20  A    Should be me.

21  Q    Okay.  It doesn't have your signature so you can't

22  confirm whether that's accurate or not, right?

23  A    Correct.

24  Q    But it says 775.  Do you see?

25  A    Yes.

1   Q    Is it true that you began to be paid consistently during

2   2016, your pay was increased to 775 per week?

3   A    Something like that.

4   Q    Was it 775 or something like 775?  Which is it?

5   A    Too long ago.  I would only say approximately.

6   Q    I draw your attention now to Plaintiffs' Exhibit 4, 2016,

7   the week of October 30th.  Do you see where your name is

8   there?

9   A    Yes.

10  Q    Now, when your counsel was asking you questions from this

11  very document, you had no dispute that it's referring to you

12  and your pay, right?

13  A    Yes.

14  Q    Do you see there that it lists there $646 for that week?

15  Would you happen to recall why that would happen?  Why did it

16  go down like that?

17  A    I think that should be the incident where I was late two

18  hours and I was deducted half a day, however was deducted.

19  Q    You say there was an incident but there must have been

20  more than one incident because you said before that you were

21  docked for that reason, right?

22  A    I don't remember precisely.

23  Q    And then you were consistently paid $775 a week

24  thereafter, is that fair?

25  A    Yes.

Lin - cross - Morel                    161

1   Q    And now we jump forward to the week of November 27th.  Do

2   you see the number there?  It's $646 again.  Was that because

3   you were docked?

4   A    I actually never seen this page.

5   Q    This is the document that you were questioned this

6   morning by your counsel.

7   A    However, I did not write this so I know nothing about

8   this.

9   Q    But you had no question as to the veracity of these

10  documents, of this document when being questioned by your

11  counsel this morning, right?

12  A    In any event, I only admit to whatever I signed.

13  Q    Jumping ahead to December, the week of December 11th,

14  2016, do you see this?

15  A    Yes.

16  Q    It says 775 again, right?

17  A    Yes.

18  Q    But you don't admit to the veracity of that because you

19  didn't sign it, is that when you're telling us?

20  A    Yes.

21  Q    And, likewise, the next page jumping to the week of

22  December 18th, you notice that there's a figure there of $582

23  for that week, do you see that?

24  A    I've not seen that before.

25  Q    Do you recall a week later, your salary going down

1   suddenly?

2   A    I have not seen this page.  I don't know.

3   Q    And you don't admit to its veracity because it doesn't

4   have your signature, is that what you're telling us?

5   A    Correct.

6   Q    Now, you testified this morning that your salary pretty

7   much was always the same, right?

8   A    Did I ever say that?

9   Q    What was that?

10  A    Did I ever said that?

11  Q    I believe you did, sir.  I believe you said that except

12  for raises in your pay, it was pretty much consistent what you

13  were being paid.

14  A    Something like that.

15  Q    Now, jumping ahead now without belaboring the point with

16  you about your signature and the verification of the document

17  that your counsel has provided us, from your own memory, do

18  you recall various instances, not one, but different, various

19  instances when your pay went down instead of up?

20  A    I never said that.

21  Q    I'm asking you now do you recall, do you recall numerous

22  instances during your employment when your pay, your weekly

23  pay went down?

24  A    No.

25  Q    Now, you told us, correct me if I'm wrong, that you

Lin - cross - Morel                                    163

1   recall one instance when you were docked in your pay because

2   you were late, remember?

3   A    Yes.

4   Q    So if your pay went down more than once, can you recall

5   what other reason, if you recall, would your pay go down?

6            MR. SCHWEITZER:  Speculation.

7            THE COURT:  Overruled.

8   A    No.  No.

9   Q    "No" what, sir?

10  A    I never said -- I never said that.  I only had that one

11  incident.

12  Q    My question is this.  You had one incident where your pay

13  was docked, right, because you said you were late, is that

14  right?

15  A    Yes.

16  Q    If you recall and it so happens that your pay went down

17  numerous times besides that, can you recall any reason other

18  than being docked for lateness why your pay would go down?

19           MR. SCHWEITZER:  Objection.

20           THE COURT:  Did you ever get less than $750 in pay?

21           THE WITNESS:  Yes.  When I first arrived, yes.

22           THE COURT:  Once you got $750 a week in pay, did

23  your pay ever go down?

24           THE WITNESS:  No.

25           THE COURT:  Did your pay go down the one time you

1   were docked?

2              THE WITNESS:  Yes.  Yes.

3              THE COURT:  Other than that one time that you were

4   late that your pay went down, did your pay ever go down?

5              THE WITNESS:  No.

6              THE COURT:  That never happened?

7              THE WITNESS:  No.

8              THE COURT:  Are you sure?

9              THE WITNESS:  Should be, yes.

10             THE COURT:  Well, not should be.  Are you sure that

11  your pay never went down except for the one time you got

12  docked for being late?  Are you sure?

13             THE WITNESS:  No, there were no other deduction of

14  my pay.

15             THE COURT:  Now, you've seen these documents that

16  counsel has shown you, correct?

17             THE WITNESS:  Yes.

18             THE COURT:  Some of those documents have a different

19  number other than your base pay, a lower number.  You see that

20  in the papers, right?

21             THE WITNESS:  Yes.

22             THE COURT:  You did not sign those pieces of paper

23  next to your name, did you?

24             THE WITNESS:  I have not even seen them before.

25             THE COURT:  This is the first time you've seen those

1    pieces of paper with the lower numbers, is that correct?

2            THE WITNESS:  Yes.

3            THE COURT:  Do you know who wrote those numbers

4    down, those lower numbers?

5            THE WITNESS:  Only Chen Zhao Lin can write it.

6            THE COURT:  Do you recognize the handwriting as that

7    of Mr. Chen Zhao Lin?

8            THE WITNESS:  Well, it should be his because every

9    time I would get paid, he's the one that asks me to sign.

10            THE COURT:  But I'm talking about the pieces of

11    paper you did not sign that have the different numbers on

12    them.  Do you recognize that handwriting as that of Mr. Lin?

13    Not the ones you signed, but the ones you didn't sign.

14            THE WITNESS:  No, I don't recognize those

15    handwriting.

16            THE COURT:  And you never saw the document, for

17    example, that's up on the screen now, Plaintiffs' Exhibit 3?

18    Next to "Danny," it's got an amount, it looks like 625.

19    You've never seen that before today, is that your testimony?

20            THE WITNESS:  I have not.

21            THE COURT:  And you don't know who wrote that, do

22    you?

23            THE WITNESS:  I don't know.

24            THE COURT:  All right.  Let's move on, Counsel.  I

25    get it.  I'm your finder of fact.  I get it.  You have

1   documents that have numbers.  He didn't sign them.  He has

2   testified under oath he hasn't seen them before.  Let's move

3   on.

4            MR. MOREL:  Thank you, Your Honor.

5   Q    Sir, do you see what I'm putting up on the screen?  This

6   is Plaintiffs' Exhibit 2.  It is a document.  It's not in your

7   name.  It's in the name of one of your co-workers.

8            Do you see that document?

9   A    Yes.

10  Q    Did you ever seen a document similar to this?

11  A    No.

12  Q    Now, you said that during your employment at Fuji

13  restaurant, that you did, in your words, side work, right?

14           MR. SCHWEITZER:  Relevance.  He's not a tipped

15  employee.

16           THE COURT:  Overruled.  Answer the question.

17           You testified about side work, right?

18           THE WITNESS:  Yes.

19  Q    And your answer was, in response to the question what did

20  you mean by that, your answer was anything related to making

21  sushi, cooking rice, et cetera?  Was that your testimony?

22  A    Yes.

23  Q    Now, what was your job again?

24  A    Well, I had a lot of work to do such as cooking rice, cut

25  the fish, move merchandise, prepare the order when the

1    customer placed their order, sweep and mop the floor.

2    Q    So if I were to ask you, if someone were to ask you

3    please tell us your job description, not your job description

4    but your job title, what was your job?

5              Were you a sushi chef at any time, by the way?

6    A    Yes.

7    Q    You were a sushi chef, correct?

8    A    Yes.

9    Q    You made sushi, you cooked rice, et cetera, right?

10   A    Yes.

11   Q    Thank you.

12             Now, you and your co-workers have gone on about

13   Chinese New Year celebrations, right?

14   A    Chinese New Year, yes.

15   Q    Do you remember the celebrations that you had over there

16   at Fuji during the Chinese New Year?

17   A    Yes.

18   Q    And people came by from different places, right?  They

19   came to celebrate with you guys, is that right?

20   A    Meaning the boss and took everybody out and ate outside.

21   Q    The lady sitting at the defense table whose name you say

22   you don't know, was she there at these celebrations that you

23   recall?

24   A    Yes.

25   Q    Was it your testimony earlier today that this young lady

1    gave you a red envelope with money in it?

2    A    Yes.

3    Q    Did you know why she would do that?

4         MR. SCHWEITZER:  Objection.

5         THE COURT:  Overruled.

6         You may respond, sir.

7    A    Well, that's what they do, Chinese New Year, they give

8    out red envelopes.  So the boss lady give out red envelopes.

9    Q    You're referring to the lady here now as the boss lady

10   now?

11   A    Yes, something like that.  I mean Chen Zhao Lin said as

12   much.

13   Q    He told you that this lady sitting here, she was a boss

14   also of yours?

15   A    Boss lady.

16   Q    Now, this word "boss," and forgive me, I don't --

17        THE COURT:  Just ask the question.

18   Q    With regard to the word "boss," do you sometimes use that

19   word to refer to someone who is not your employer, who was not

20   your supervisor?

21        MR. SCHWEITZER:  Objection.

22        THE COURT:  Sustained.  Ask another question.

23   Q    You also told us that you would sometimes get

24   instructions from Mr. Chen coming from who you referred to the

25   big boss, remember?

1          THE INTERPRETER:  Can you ask me again?  I'm not

2   sure I heard the whole question.

3          THE COURT:  Madam Court Reporter, please read the

4   question back.

5              (Record read.)

6              (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (JIAN HUI LIN, the witness, resumed, through the

2     interpreter Arthur Kwok.)

3     CROSS-EXAMINATION (CONTINUED)

4     MR. MOREL:

5     Q    Now, you told us that Mr. Chen would give you tasks to

6     do in the name of Larry Zhou; you remember you told us that?

7     A    Yes.

8     Q    Do you know how these instructions came about; did they

9     come by phone or some other way?

10    A    I don't really know.  But Chen Zhao Lin go to Tomo very

11    often.

12    Q    What kind of instructions did Mr. Chen convey to you as

13    coming from Mr. Zhou, from Mr. Larry Zhou?

14    A    Well, such as do not put the tip box in front of the

15    sushi counter.

16    Q    And Mr. Chen told you that Mr. Zhou wanted you to know

17    that?

18    A    Yes.

19    Q    And as you sit here today, are you telling us that

20    everybody, as far as you know, referred to Mr. Larry Zhou as

21    the big boss over at Fuji?

22    A    Yes.

23         MR. MOREL:  Nothing further, Your Honor.

24         THE COURT:  Any redirect?

25         MR. SCHWEITZER:  No, Your Honor.

1          THE COURT:  Thank you.  You may step down.

2          Thank you.

3          (Witness excused.)

4          THE COURT:  Please call your next witness.

5          MR. SCHWEITZER:  No further witnesses, Your Honor.

6          THE COURT:  Plaintiff rests?

7          MR. SCHWEITZER:  Yes, Your Honor.

8          THE COURT:  All right.  Defense, please call your

9     first witness.

10         MR. MOREL:  I would like to call Mr. Larry Zhou.

11         THE COURT:  Please come forward and be sworn.

12         THE COURTROOM DEPUTY:  Would you please raise your

13    right hand?

14         Do you solely swear or affirm that the answers and

15    the testimony that you are about to give to the Court will

16    be the truth, the whole truth, and nothing but the truth?

17         THE WITNESS:  Yes.

18         THE COURTROOM DEPUTY:  Please state your name for

19    the record --

20         THE COURT:  How about "so help you God?"

21         THE COURTROOM DEPUTY:  So help you God?

22         THE WITNESS:  Yes, sir.

23         THE COURT:  Try again.

24         THE COURTROOM DEPUTY:  Do you solely swear or

25    affirm that the answers and the testimony that you are about

1    to give to the Court will be the truth, the whole truth, and

2    nothing but the truth so help you God?

3              THE WITNESS:  Yes.

4    **"L A R R Y"  D I A N  C A I  Z H O U**,

5              called as a witness having been first duly

6              sworn/affirmed, was examined and testified as

7              follows through the Interpreter Arthur Kwok:

8              THE COURTROOM DEPUTY:  Please state your name for

9    the record.

10             THE WITNESS:  Larry Zhou.

11             THE COURT:  You may proceed, Counsel.

12             MR. MOREL:  Just one moment, Your Honor, please.

13             THE COURT:  Yes, just use the microphone again,

14   sir, when you're speaking.  We can barely hear you without

15   it.

16             MR. MOREL:  Thank you, Your Honor.

17   DIRECT EXAMINATION

18   BY MR. MOREL:

19   Q    Mr. Zhou, you're using an interpreter.  Do you

20   understand some English?

21   A    I do, I know some.

22   Q    Do you feel more comfortable with a Mandarin

23   interpreter?

24   A    Yes.

25   Q    What is your full legal name?

1   A    Larry, D-I-A-N, C-H-I, Z-H-O-U, so it's Larry Dian Cai
2   Zhou.
3   Q    Now, is Larry your legal name or that an American
4   adoption, adopted name?
5   A    Yeah, that's part of my legal name.
6   Q    Do you know the young lady sitting there at the table?
7   A    Yes.
8   Q    How do you know her?
9   A    She's my wife.
10  Q    Okay.  And about how long have you been married now?
11  A    We got married in 2000.
12  Q    Have you ever been in business with her; have you ever
13  participated in any kind of business with your wife?
14  A    I don't think we were ever partners.
15  Q    Joe Japanese Buffet Restaurant, are you familiar with
16  that restaurant?
17  A    Yes.
18  Q    And how are you familiar with that restaurant?
19  A    That would be Mr. Chen's restaurant.
20  Q    Okay.  Is that restaurant known by -- no, withdrawn.
21       Joe Japanese Buffet Restaurant, Inc., is that the
22  name of the restaurant or is that the name of a company?
23  A    Company name.
24  Q    And what is the name of the restaurant, if it is
25  something else?

1    A    Fuji Japanese Cuisine.

2    Q    And do you recall where that restaurant is located?

3    A    113-27 Queens Boulevard.

4    Q    Have you ever had any ownership interest in that

5    restaurant?

6    A    No.

7    Q    Were you ever associated in any way, other than as an

8    owner, with Fuji Japanese Cuisine?

9    A    Well, it's my cousin's restaurant.

10   Q    Tell us about that.

11   A    So my cousin, his name is Zhou Xin Cai.  So he has a

12   Chinese restaurant in New Hampshire, and at that time he

13   wanted to open a restaurant in New York, however.

14   Q    When you say "at that time," what time are you talking

15   about?

16   A    A long time ago.  I don't remember exactly, but it was

17   before Fuji opened up.

18   Q    Go on.

19   A    So he came to New York scouting for a location, and

20   eventually he found that location.

21   Q    And did your cousin manage a restaurant over at this

22   location?

23   A    Yes.  He opened that one, he did.

24   Q    And was it named Fuji Japanese Cuisine at that time --

25   or already or was that a new name?

1  A    Fuji has always been the name.

2  Q    So to your knowledge were there owners there before

3  your cousin running the restaurant named Fuji Japanese?

4  A    No, no.  At that time, it was an empty space.

5  Q    And so did your cousin take over that empty space and

6  develop this restaurant?

7  A    Yes.  He renovated the place and started doing business

8  there, yes.

9  Q    And did you assist, help your cousin in any way to

10  establish this restaurant?

11  A    I did.

12  Q    What, if anything, did you do to help your cousin

13  establish this restaurant?

14  A    Actually, quite a lot, because he would ask me whatever

15  he doesn't know.

16  Q    Like what?

17  A    So basically, there's a huge difference, obviously,

18  between Japanese and Chinese cuisine.  That's the first

19  point first of all.  And then sushi bar, also different from

20  Chinese restaurants.  It has to be usually in a certain

21  position in the restaurant.  Also the kitchen setup is

22  different in a Japanese restaurant than a Chinese

23  restaurant.  So all these things entail the initial phase of

24  renovation.

25  Q    Did you give your cousin advice regarding the starting

1   and running of Japanese cuisine restaurant?

2           MR. SCHWEITZER:  Leading.

3           THE COURT:  Overruled.

4   A    Well, I answer everything he asks me.

5   BY MR. MOREL:

6   Q    Now, do you have any particular qualifications to be

7   giving advice to someone starting a restaurant?

8   A    Well, I started working in the restaurant business

9   since 1993, and 2003/2004 around that time, I had my own

10  restaurant.

11  Q    You had your own restaurant?  Where was that; where was

12  your own restaurant?

13  A    That would be Tomo.

14  Q    Tomo at what address?

15  A    89-14 Queens Boulevard.

16  Q    And that would be --

17  A    And then --

18  Q    That would be at Elmhurst?

19  A    Yes.

20  Q    Okay.  Anything else?

21  A    '07 I opened up another Tomo in Jackson Heights.

22  Q    And were the two Tomo restaurants running at the same

23  time?

24  A    Yes.

25  Q    Did there come a time when someone took over the Tomo

1   restaurant in Elmhurst from you?

2   A    Yes.  So because I wanted to try something else,

3   something new at that time, so I gave the restaurant to my

4   wife at that time.

5   Q    That would be Tomo in Elmhurst?

6   A    Yes, and Jackson Heights also.

7   Q    So your wife actually was running both restaurants at

8   one time?

9   A    Yes.

10  Q    Did there come a time when she stopped operating either

11  or both of those restaurants?

12  A    So because it was very tiresome work, plus the fact

13  that I was not in the U.S. a lot of the time at that time,

14  so it was too much for her.  So she gave up one of the Tomos

15  to one of the employees that used to work there.

16  Q    Which one of the Tomos did she give up?

17  A    The Tomo in Jackson Heights.

18  Q    Do you recall approximately what year it was when she

19  did that?

20  A    I don't really remember, maybe 2013, 2014 -- '14.

21  Q    Are you familiar with a company called Roka Japanese

22  Food, Inc.?

23  A    Yes.

24  Q    How are you familiar with that name, Roka Japanese

25  Food, Inc.?

1  A    My wife changed the name of the company after -- to

2  this name after I gave her -- after I gave it to her.

3  Q    Now, Roka Japanese Food, Inc., you're saying is your

4  wife's company?

5  A    Yes.

6  Q    And what was the name of the restaurant at the location

7  in Elmhurst?

8  A    Tomo Japanese Café, cafe.  Tomo Japanese Café.

9  Q    If you recall, when your wife took over the Elmhurst

10 restaurant on the Roka Japanese, Inc., did it already have

11 that name Tomo or something else?

12 A    Yes, before that it was Tomo, D/B/A Tomo.

13 Q    And do you know why she would choose to -- did she tell

14 you why she would choose to keep the name Tomo?

15 A    Because generally Tomo is a popular name, a lot of

16 people like it, and also to retain old customers.

17 Q    By "old customers," do you mean goodwill?

18 A    What do you mean by goodwill?  I'm talking about old

19 customers, previous customers.

20 Q    Okay.

21       All right.  So the reputation of the restaurant

22 when you required it?

23       MR. SCHWEITZER:  Leading.

24       THE COURT:  Overruled.

25       I thought old customers was fine, but if he wants

1   to talk about goodwill or reputation, put words in the mouth

2   of his own witness, that's fine.  The Court knows what's

3   going on.

4            Go ahead.

5   BY MR. MOREL:

6   Q    So you wanted to preserve your old customers?

7   A    She wanted to.  She wanted to.

8   Q    Now, in the complaint, there is a Tomo Japanese

9   Café, Inc., named.  Were you ever involved with

10  Tomo Japanese Café, Inc., the company, not the restaurant,

11  the company?

12  A    Yes.

13  Q    How were you related to Tomo Japanese Café, Inc.?

14  A    That belongs to me.

15           MR. MOREL:  May I have one second, Your Honor, so

16  I can get...

17           THE COURT:  Yes, of course.

18           (Pause in proceedings.)

19  Q    I'm showing you a document here for identification

20  marked as Exhibit F.

21  A    Okay.

22           (Defendants' Exhibit F is published for

23  identification in open court.)

24  Q    Do you recognize -- let me bring this out also so you

25  can see the whole thing there.

1           There.  Do you recognize this document?

2    A    Looks familiar.

3    Q    All right.

4    A    I think I've seen it before.

5    Q    Is that your name on there?

6    A    Yes.

7    Q    Do you see the address 8612-A 37th Avenue,

8    Jackson Heights?

9    A    Yes.

10   Q    Do you see that this is an entity and information

11   regarding Tomo Japanese Cuisine, Inc.?

12           Do you see that?

13   A    Yes.

14   Q    And is that the Tomo Japanese Cuisine, Inc. that you

15   testified you owned?

16   A    Yes, yes.  That -- that's my company, yes.

17   Q    And is this corporation still active?

18   A    No, this company already closed down.

19   Q    And when was it closed down?

20   A    I think 2013.

21           MR. MOREL:  Your Honor, I would like to introduce

22   this into evidence.

23           THE COURT:  Any objection to Exhibit F coming into

24   evidence?

25           MR. SCHWEITZER:  None, Your Honor.

1          THE COURT:  Admitted.

2          (Defendants' Exhibit F so marked and received in

3     evidence.)

4          MR. MOREL:  Thank you, Your Honor.

5     BY MR. MOREL:

6     Q    So you were the chief executive officer of Tomo

7     Japanese Cuisine, Inc., according to this document; is that

8     right?

9     A    Yes.

10    Q    Now, while you were the chief executive officer of that

11    corporation, were any of the plaintiffs in this action ever

12    employed by you?

13    A    No.

14    Q    Let's go back to Fuji Japanese Cuisine -- let's go back

15    to Fuji Japanese Cuisine Restaurant we're talking about.

16    After your cousin -- there came a time when your cousin

17    left, you told us?

18    A    Yes.

19    Q    And what, if anything --

20    A    And he returned to New Hampshire because business was

21    not great, was not good.

22    Q    And what, if anything, happened to that restaurant

23    after your cousin left?

24    A    After that, Mr. Chen took over.

25    Q    When you say "Mr. Chen," who are you referring to?

1   A     Chen Zhao Lin.

2   Q     That's the gentleman sitting at the defense table

3   there?

4   A     Yes.

5   Q     Now, how long have you known Mr. Chen?

6   A     A long time.

7   Q     Would you say you were friends?

8   A     Yes.

9   Q     And when Mr. Chen took over Fuji Japanese Cuisine

10  Restaurant, did he ask for your advice or anything like that

11  in running the restaurant?

12  A     Yes.

13  Q     And to your knowledge what kind of skills did Mr. Chen

14  have to engage in the restaurant business?

15  A     Because he used to work for us for many years, I think

16  since about 2005.

17  Q     Where did he work for you since 2005?

18  A     Tomo, the Elmhurst location.

19  Q     The Elmhurst -- okay.  When you say he used to work for

20  "us," you and who else?

21  A     I meant just myself.

22  Q     So when you owned Tomo at Elmhurst, Mr. Chen here used

23  to work for you?

24  A     Yes.

25  Q     Did he ever work your wife?

1    A    Yes.

2    Q    And in what capacity did Mr. Chen work for you and/or

3    your wife?

4    A    Kitchen work, sushi-bar work, basically any kind of

5    work in the restaurant he has done before.

6    Q    And there came a time you told us that he took over

7    Fuji Japanese Cuisine Restaurant?

8    A    Yes.

9    Q    And are you familiar with the company named

10   Joe Japanese Buffet Restaurant, Inc.?

11   A    Yes.

12   Q    Who came up with that name?

13   A    Well, Joe is his English name.

14   Q    When was say "his English name," who are you referring

15   to?

16   A    I meant that is Mr. Chen Zhao Lin's English name.

17   Q    And did you render any assistance to Mr. Chen in him

18   taking over Fuji Japanese Cuisine after your cousin left?

19   A    Help?  Yes.

20   Q    What kind of help?

21   A    Well, the liquor license he's using now is mine, for

22   example.

23   Q    Anything else?

24   A    Not much else.

25   Q    Do you help him with, say, paperwork involving the

1  company?

2  A   Well, I would explain to him whenever he asked whatever

3  he doesn't know what to do or understand.

4  Q   Is that because you had superior experience in managing

5  a restaurant?

6  A   That's one reason.  Also he was a friend.

7  Q   Now, did you ever receive any financial benefit from

8  Joe Japanese Buffet Restaurant, Inc.?

9  A   No.

10  Q   Have you ever been a manager at the restaurant run by

11  Joe Japanese Buffet Restaurant?

12  A   No.

13  Q   Have you ever hired anybody at Fuji Japanese Cuisine

14  Restaurant?

15  A   No.

16  Q   Have you ever had anything to do with the payroll,

17  paying employees at Fuji Japanese Cuisine Restaurant?

18  A   No.

19  Q   Okay.  Have you ever given instructions, directions to

20  any of the employees at Fuji Japanese Cuisine involving

21  their work?

22  A   No, huh-uh.  No, I mean, Mr. Chen by himself was

23  sufficient for that.

24  Q   You heard the testimony of the plaintiffs in this

25  case -- we've been here two days now, right?

1    A    I did.

2    Q    You've heard them say lately, the last witness, Mr. Lin

3    sitting here, did you hear him say that you would call

4    Mr. Chen and give him instructions to convey to the

5    employees; did you hear that testimony?

6    A    Yes, I heard him.  Yes.

7    Q    As you sit here today under oath, can you tell us, is

8    that true, did you ever do that?

9    A    No --

10   Q    Did you ever --

11   A    -- never.

12   Q    Did you ever communicate to Mr. Chen that he should

13   adopt or use certain procedures at the restaurant?

14   A    No.  Every restaurant have their own rules of their

15   own.

16   Q    That testimony was not true?

17   A    Well, in any event, I never said it.

18   Q    Did you ever say anything about, for example, where to

19   place a tip box in the restaurant at the Fuji restaurant?

20   A    No.

21         However, at Tomo, I -- however, at Tomo when I was

22   running it, I might -- my habit was to not have the tip box

23   in front of the customers.  I don't want them to feel like

24   they have to tip.  So that's just me at that time.

25   Q    Were you ever involved in that kind of a discussion

1    with regard to Fuji Japanese Cuisine and Mr. Chen?

2    A    No.

3    Q    Did you ever hear yourself referred to by anyone as

4    "the big boss"?

5    A    No.  Today's the first time in my life that I heard

6    anybody call me supposedly Big Boss.

7    Q    You heard testimony that, in fact, everybody over at

8    Fuji's used to refer to you as Big Boss; you heard that

9    testimony?

10   A    I heard that testimony, yes.

11   Q    Are you telling us that that's not true?

12   A    Well, what I can say is no one ever called me by that

13   before.

14   Q    Now, in the restaurant business and in your dealings

15   with different restaurants, did anybody ever call you

16   Mr. Boss, Big Boss, or anything of the sort?

17   A    I heard other people call me Boss, but not Big Boss.

18   In my community, Boss is just a name, not necessarily -- not

19   necessarily an actual position.

20   Q    After Mr. Chen took over Fuji restaurant -- Japanese

21   restaurant, did you ever have occasion to visit there, to go

22   there for any reason?

23   A    Yes.

24   Q    With what kind of frequency, approximately?

25   A    Approximately less than five times until today.

1  Q    During the whole time, you're telling us five times

2  during the whole time?

3  A    Yes.

4  Q    And for what purpose today did you -- purpose or

5  purposes did you have occasion to visit Fuji Japanese

6  Cuisine?

7  A    So basically, we don't have any business dealings

8  between us, so basically going there without any covers.

9  One time or a couple times I passed by, so I went in.

10 Q    You told us that you and Mr. Chen had been friends for

11 a long time, right?

12 A    Yes.

13 Q    Now, did you ever hear anybody over at -- when you were

14 there at Fuji Japanese Cuisine refer to your wife as

15 Madam Boss?

16        THE INTERPRETER:  I'm sorry, could I have that

17 question again?

18        THE COURT:  Read the question back, please.

19        (Requested portion read back.)

20 A    I don't have any particular memory of that, but

21 generally speaking, my friends, they do call her Lady Boss.

22 BY MR. MOREL:

23 Q    Lady Boss, they would call her that where?  Did they

24 ever do that over at Fuji Japanese Cuisine?

25 A    I mean at parties, people would call her that, for

1  example.

2  Q    Was your wife known in the community as the person who

3  owned and ran Tomo Japanese Cuisine over in Elmhurst?

4  A    Yes.

5  Q    Now, you've been married a long time.  Do you ever

6  discuss with your wife concerning her business dealings?

7  A    Yes, we discuss sometimes.

8  Q    And to your knowledge has your wife frequented with any

9  frequency Fuji Japanese Cuisine Restaurant?

10  A    No.

11  Q    Did you ever attend Chinese New Year celebrations over

12  at Fuji's?

13  A    Yes.

14  Q    What about your wife?

15  A    Yes.

16  Q    What is your wife known as in the community and at the

17  location where she works?

18  A    Do you mean within the restaurant?

19  Q    What name is she known as, your wife?

20  A    Joyce.

21  Q    Now, what is her -- her name is Mei Lin, right?

22  A    Yes.

23  Q    So to your knowledge does anybody at work ever call her

24  Mei Lin?

25  A    Never.

1  Q    Is there any reason why the plaintiffs would refer to
2  her as Mei Lin?
3           MR. SCHWEITZER:  Objection.
4           THE COURT:  In your opinion?
5           Overruled.
6  A    Plaintiff's attorney?
7  BY MR. MOREL:
8  Q    No, the plaintiffs.
9  A    That, I don't know.  I don't know why he used it.  But
10 what I can really tell you is no one knows that name except
11 people in the family.
12 Q    Were you ever involved with a restaurant called
13 Cherry Blossom Buffet, Inc.?
14 A    No, I have never been involved.
15 Q    In the complaint it's listed as a corporate entity
16 doing business as Tomo Japanese Cuisine, Jackson Heights.
17 Now, Tomo Japanese Cuisine, Jackson Heights, is that the
18 Tomo Japanese Cuisine that you said you and your wife --
19 and/or your wife ran at some point?
20 A    Yes, yes.
21 Q    Cherry Blossom Buffet, Inc., that company doing
22 business as Tomo Japanese Cuisine, did it belong to your
23 wife, Mei Lin?
24 A    Cherry Blossom?  No.
25 Q    Do you recognize the name Yong Lin, Y-O-N-G, L-I-N?

1    A    Yes.

2    Q    Who is that?

3    A    He is the boss, owner over Cherry Blossom.

4    Q    Did a liquor license in your name -- was there a liquor

5    license in your name ever at the restaurant of

6    8612-A 37th Avenue, Jackson Heights, Cherry Blossom Buffet,

7    Inc.?

8    A    Do you mean on the liquor license?

9              (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. MOREL:  (Continuing)

2  Q    Yes, a liquor license in your name.  Was it ever, that

3  liquor license in your name ever appear at that restaurant at

4  8612A 37th avenue.

5  A    Yes.  Yes, until -- I lend it to him until he got his

6  own.

7  Q    Were you ever a manager or owner of the restaurant over

8  at, in Jackson Heights, 8612A 37th Avenue?

9  A    Well, I opened this originally, yes.

10  Q    And were you ever an employee at that restaurant?

11  A    Well, when they were short-handed, I did go over there

12  and help out, I did.

13  Q    Are you familiar with a company named Sunrise Japanese

14  Food Inc.?

15  A    Yes.

16  Q    DBA, doing business as Tomo Japanese Cuisine, Jackson

17  Heights?

18  A    When I told you that I stopped doing it and gave it to my

19  wife and she changed the name, she changed it to Sunrise, to

20  this name.

21  Q    So your wife changed the name over to Sunrise?

22  A    Sunrise, the company, yes.

23  Q    But it's still the Tomo Japanese restaurant in

24  Jackson Heights?

25  A    Yes.

1  Q    Are you currently -- excuse me.

2         Are you currently receiving any income from any of

3  these restaurants that I've mentioned?

4  A    If I work at the Jackson Heights location, I would have

5  income.

6  Q    Do you get income as an employee or do you get income

7  from some kind of managerial or ownership position?

8  A    Yes.

9  Q    Do you know, Mr. Jian Hui Lin also known as Danny Lin

10 sitting here, the plaintiff?

11 A    No, I don't, and I only met one of the plaintiffs before.

12 Q    Of all the plaintiffs here, the young ladies who were

13 here yesterday and Mr. Lin, which one of those plaintiffs are

14 you familiar with?

15 A    Possibly this person whose name may be R. Lin or A. Lin,

16 I'm not sure.

17 Q    And how do you know her?

18 A    I seen her in the past when I visited Fuji.

19 Q    Did you ever see Mr. Lin there?

20 A    I don't remember anything like that.

21 Q    Did you ever give any of the employees over at Fuji a red

22 envelope with money during the Chinese New Year's celebration?

23 A    No.  I think that might be Mr. Chen's job to do.

24         MR. MOREL:  Nothing further, Your Honor.

25         THE COURT:  We'll take a 10 minute break and then

1    we'll have cross-examination of the witness.

2              Do not talk with anyone during the break about

3    testimony.  Okay?

4              (Recess taken.)

5              THE CLERK:  Third call.  Docket number 17-CV-03435,

6    Lin versus Joe Japanese Buffet, Inc., et al.

7              THE COURT:  Please be seated.

8              Witness, return to the stand to resume your

9    examination.

10             I ask you, sir, did you speak to anyone during the

11   break?

12             THE WITNESS:  No.

13             THE COURT:  Thank you.

14             Counsel, you may begin your cross-examination.

15             MR. SCHWEITZER:  Thank you, Your Honor.

16   CROSS-EXAMINATION

17   BY MR. SCHWEITZER:

18   Q    So the corporations, in turn, operating Fuji Japanese

19   Cuisine Restaurant were, first, Fuji Japanese Cuisine Inc.

20   under Dian Chi Zhou and then Joe Japanese Buffet Inc. under

21   Zhao Lin Chen, is that correct?

22   A    Can you repeat that question?

23             THE COURT:  Read it back.

24             (Record read.)

25   A    Well, Fuji Inc. was under Dian Cai Zhao.  And the other

1   one, I don't know.

2   Q    The other one would be Joe Japanese Buffet Restaurant,

3   Inc., is that correct?

4   A    Yes.

5   Q    When did the changeover from Fuji Japanese Cuisine Inc.

6   to Joe Japanese Buffet Restaurant Inc. take place

7   approximately?

8   A    I don't remember when that was.  I don't remember.

9   Q    Would it be fair to say it was around December of 2014?

10  A    Well, I did not participate in the change of the name.

11  Q    You said you didn't participate.  Isn't it true that you

12  informed Zhao Lin Chen that Dian Cai Zhou was looking to sell

13  his restaurant?

14  A    Yes, someone was willing, someone wanted to sell but

15  exactly when that was, I don't remember exactly in terms of

16  the timeline.

17  Q    Would it refresh your recollection to know that Joe

18  Japanese Buffet Restaurant, Inc. was formed on December 22,

19  2014?

20  A    It should be around that period of time but I'm not

21  certain.

22  Q    All right.  Let's move over to Tomo Japanese Cuisine in

23  Jackson Heights.

24              Now, in turn, the corporations operating that entity

25  were, one, Tomo Japanese Cuisine Inc., two, Sunrise Japanese

1    Food Inc. and, three, Cherry Blossom Buffet Inc., correct?

2    A    Yes.

3    Q    And you said Tomo Japanese Cuisine Inc. was your company,

4    correct?

5    A    Yes.

6    Q    And Sunrise Japanese Food Inc. was your wife's company,

7    correct?

8    A    When she was operating it, she changed it to this name.

9    Q    So Sunrise Japanese Food Inc. was your wife's company,

10   yes?

11   A    Yes.

12   Q    And Cherry Blossom Buffet Inc. was Zhao Lin's company,

13   correct?

14   A    Yes.

15   Q    Okay.  About when did the changeover from your company,

16   Tomo Japanese Cuisine Inc., to your wife's company, Sunrise

17   Japanese food Inc., take place?

18   A    I think it should be around 2013.

19   Q    And you mentioned on direct that you gave the restaurant

20   to your wife.  Did your wife's company give your company any

21   money in exchange for being given the business?

22   A    No, it was a gift to her.  The restaurant was a gift to

23   her.

24   Q    And under all three corporations, Tomo Japanese Cuisine

25   continued using the name Tomo Japanese Cuisine, correct?

Zhou - cross - Schweitzer                 196

1   A     Yes.

2   Q     Isn't it true that when your cousin Dian Cai Zhou wanted

3   to start up Fuji, he gave him Tomo's menu to use as a model?

4   A     Yes.

5   Q     All right.  And let's talk about for a moment Tomo

6   Japanese Cafe in Elmhurst.  Now the corporations operating

7   that restaurant were, in turn, one, Tomo Japanese Cafe Inc.,

8   Roka Japanese Food Inc. and Ginger Dollar Sushi Inc., correct?

9           MR. SCHWEITZER:  Arthur, do you need it repeated?

10          THE INTERPRETER:  No, I got it.

11          MR. MOREL:  Objection.  That mischaracterizes --

12          THE COURT:  Whoa.  Whoa.  Read the question again.

13  Let's have a translation.

14          Please read back the question.

15          (Record read.)

16  A     Well, when the restaurant was given to her, she changed

17  the corporate name to Roka, however, she or they did not

18  operate them at the same time.  So when it was Tomo, I was

19  operating it.  And Roka was the time period that my wife was

20  operating it.  Right now, it's called Ginger.

21  Q     Okay.  So would it be fair to say that Tomo Japanese Cafe

22  Inc. was your company and Roka Japanese Food Inc. was your

23  wife's company?

24  A     Tomo Japanese Inc., right?

25  Q     Tomo Japanese Cafe Inc.

Zhou - cross - Schweitzer                    197

1   A     Correct, I was running it at the time.

2   Q     And Roka Japanese Food Inc. would be your wife's company,

3   right?

4   A     Yes.

5   Q     And Ginger Dollar Sushi Inc. is also your wife's company,

6   isn't it?

7   A     She's taking care of it, I suppose, yes.

8   Q     And isn't it true that Ginger Dollar Sushi Inc. was

9   formed and took over Tomo Japanese Cafe during the pendency of

10  this lawsuit?

11  A     Prior to this.

12            THE COURT:  When?  What year?

13            THE WITNESS:  I'm not exactly sure.  I wasn't

14  running it so maybe my wife knows.

15            THE COURT:  Are you generally sure?

16            THE WITNESS:  Yes, I'm sure.  I just don't remember

17  when.

18            THE COURT:  You're sure it was before this lawsuit?

19            THE WITNESS:  I don't know.  I'm not sure.

20            THE COURT:  So you're not sure it was before this

21  lawsuit?

22            THE WITNESS:  Correct.

23            THE COURT:  Go on.

24  Q     At your deposition, do you recall being asked the

25  following questions and giving the following answers?

CMH      OCR      RMR      CRR      FCRR

1          THE COURT:  Date, page and line.  And the way you do

2   it, Counsel, is:  At your deposition on X-Y date, after you

3   were sworn in, were you asked these questions and did you give

4   these answers.  All right?  That's how you do it.

5   Q    On March 1, 2019, under oath at deposition, did you

6   ask -- were you asked the following questions and did you give

7   the following answers, beginning page 80, line 17?

8          THE COURT:  Ending?

9          MR. SCHWEITZER:  Ending page 81, line 7.

10         THE COURT:  Okay.

11  Q    Question:  Was there a transfer of ownership of Tomo

12  Japanese Cafe from Roka Japanese Food Incorporated to Ginger

13  Dollar Sushi Incorporated?

14         Answer:  Yes.  I was told about it, yes.

15         Question:  When did that take place?

16         Answer:  I don't know.

17         Question:  Was it around July 2018?

18         Answer:  Should be, yes.

19         THE COURT:  Do you recall being asked those

20  questions and giving those answers?

21         THE WITNESS:  Yes.

22         THE COURT:  Now, Counsel, just to be clear, when was

23  the lawsuit filed in this case?

24         MR. SCHWEITZER:  June 2017, Your Honor.

25         THE COURT:  Go ahead.  Ask your next question.

1  Q    Was the transfer from Roka to Ginger Dollar done for the

2  purpose of hiding assets?

3  A    No.

4  Q    I'm showing you a document that's been marked for

5  identification as Plaintiffs' Exhibit 10.

6          I apologize for the quality of the image but do you

7  recognize it?

8  A    Yes, that's the restaurant website.

9          THE COURT:  Which restaurant?

10         THE WITNESS:  Tomo.

11         THE COURT:  Go ahead.

12 Q    And does that restaurant website list both Tomo

13 locations?

14 A    Yes.  This was done when I was managing and running both

15 at the same time.

16 Q    Are you aware that this copy of the website was taken in

17 approximately 2018?

18 A    I don't know when we took this.

19 Q    Now, it's very small and very faint so I'm going to try

20 to capture it.

21         THE COURT:  Counsel, do you want to offer this

22 document into evidence?

23         MR. SCHWEITZER:  Yes, Your Honor.

24         THE COURT:  Do you want to do it now?

25         MR. SCHWEITZER:  I have one prefatory question but

 1    if the Court is ready, I'll do it.

 2          THE COURT:  The question is are you ready?

 3          MR. SCHWEITZER:  I'll ask that it be offered into

 4    evidence.

 5          THE COURT:  He's offering the document.  Any

 6    objection?

 7          MR. MOREL:  Yes, Your Honor.

 8          THE COURT:  What's the objection?

 9          MR. MOREL:  Authentication.

10          THE COURT:  Overruled.  It's admitted.

11          (Plaintiffs' Exhibit 10 so marked.)

12    Q    Now you said this website was done when you were managing

13    both Tomo locations, right?

14    A    Yes.

15    Q    And you said that the Tomo Japanese Cuisine location was

16    given over to your wife in 2013, correct?

17    A    Yes.

18    Q    And when was Tomo Japanese Cafe given over to Roka

19    Japanese Food Inc.?

20    A    I don't really remember.  Can you mention the time again?

21    I seem to not to remember.

22          THE COURT:  When you said 2018, Counsel, does that

23    ring a bell?

24          MR. SCHWEITZER:  No, Your Honor.  That referred to

25    something else.

1    Q    Was the transfer to Roka in about 2011?

2    A    Possibly, yes.

3    Q    Okay.  And isn't it true that this website is marked as

4    being created in 2014?

5    A    We didn't do the website ourselves.  It was done by this

6    company called Blue Sky so perhaps this was an update and

7    before that, there was a website already.

8            THE COURT:  Can you read the question back to the

9    witness, please.

10           (Record read.)

11           THE COURT:  Yes or no.

12           THE WITNESS:  I have never seen that timestamp

13   before.

14           THE COURT:  Do you have the website, Counsel, in a

15   document you can show this witness?

16           MR. SCHWEITZER:  I do.

17           THE COURT:  Why don't you show it to him so that we

18   can move this along, please.  There shouldn't be any guessing

19   games about it.

20           MR. SCHWEITZER:  I am.  It's at the bottom of the

21   document.

22           THE COURT:  Do you see that, sir, 2014?

23           THE WITNESS:  Yes, I see that.

24           THE COURT:  What's your question, Counsel, now that

25   he sees it?

1   Q    Is it your testimony that you were operating Tomo Cuisine

2   and Tomo Cafe in 2014?

3   A    No longer.

4   Q    So when you said the two Tomo locations were listed

5   together on the website because you were operating them at the

6   time, that was incorrect?

7   A    Well, because this website was updated at a later, later

8   date, later on, updated in 2014.  However, at that time, they

9   didn't split the two company or two restaurant.

10            THE COURT:  At what time?

11            THE WITNESS:  After I stop operating, I didn't --

12   after that, I didn't say in particular whether this should be

13   taken down or not.  I didn't go after that.  And I've

14   forgotten everything about this website as well.

15            THE COURT:  Ask your next question.

16            MR. SCHWEITZER:  Okay.

17   Q    Coming back to an earlier question I had, you said that

18   you gave your cousin Tomo's menu as a model to use for Fuji,

19   right?

20   A    Yes, that's right.  When he came, he referenced the Tomo

21   menu, yes.

22   Q    I'm showing you what's been marked for identification as

23   Plaintiffs' Exhibit 8.  This is another excerpt from the Tomo

24   website.  Is this that menu?

25   A    Should be the menu over there, yes.

1      MR. SCHWEITZER:  Okay.  I ask that Exhibit 8 be

2  moved into evidence.

3      THE COURT:  Any objection?

4      MR. MOREL:  No objection, Your Honor.

5      THE COURT:  Admitted.

6      (Plaintiffs' Exhibit 8 so marked.)

7  Q    I'm now showing you what's been marked for identification

8  as Plaintiffs' Exhibit 7.  Is that the Fuji menu?

9  A    I don't know.

10 Q    Let me move this around a little bit.  I moved the

11 exhibit around so that you can see the top.

12     Does that refresh your recollection as to whether

13 that's the Fuji menu?

14 A    Yes.

15     MR. SCHWEITZER:  Okay.  I ask that Exhibit 7 be

16 entered into evidence.

17     THE COURT:  Any objection?

18     MR. MOREL:  No objection.

19     THE COURT:  Admitted.

20     (Plaintiffs' Exhibit 7 so marked.)

21 Q    And Fuji's website was also created in 2014 by Blue Sky,

22 wasn't it?

23 A    I gave my cousin information, the information for

24 Blue Sky.

25 Q    And Blue Sky created Fuji's website, didn't it?

1  A    Yes.

2  Q    Now, you mentioned that you helped your cousin get a

3  liquor license for Fuji Japanese Cuisine, correct?

4  A    It's his -- well, it's his license with his name on it.

5  Q    And your name on it as well, correct?

6  A    Yes.

7  Q    Is this that license?

8  A    Should be, yes.

9  Q    And did you help Joe Japanese Buffet Restaurant Inc. get

10 a liquor license?

11 A    Yes.

12 Q    Is this that license?

13 A    Yes.

14      MR. SCHWEITZER:  Your Honor, I ask that Exhibit 1 be

15 entered into evidence.

16      THE COURT:  Any objection?

17      MR. MORE:  No objection.

18      THE COURT:  It's admitted.

19      (Plaintiffs' Exhibit 1 so marked.)

20 Q    Why did you put your name on your cousin's license?

21 A    At the time, he was applying for a liquor license for

22 over half a year and still couldn't get it and he was out of

23 ways of getting it so he asked me for help and then,

24 altogether, used nine months to apply and realized at that

25 point after 9 months that my cousin had a moving violation in

Zhou - cross - Schweitzer                    205

1  New Hampshire and that was the reason he couldn't get it, but

2  that was found out later.

3  Q    His name ultimately wasn't excluded from the liquor

4  license, was it?

5  A    No.

6  Q    Did you represent to the New York State Liquor Authority

7  or to the Queens Community Board that you're in possession or

8  control of the premises of Fuji Japanese Cuisine in order to

9  obtain the liquor license?

10 A    I don't think so.

11 Q    Without doing that, could you have obtained a liquor

12 license?

13            MR. MOREL:  Objection.

14            THE COURT:  Sustained.  Sustained.

15 Q    Now, the liquor license for Fuji Japanese Cuisine Inc.

16 expired in July of 2015, correct?

17 A    Should be, should be, yes.  If that's what's written

18 here, should be, yes.

19 Q    And by that time, Joe Japanese Buffet Inc. had taken over

20 operation of Fuji Japanese Restaurant, correct?

21 A    I don't really know but probably yes.

22 Q    Okay.  Did you apply for a new liquor license on behalf

23 of Joe Japanese Buffet Restaurant Inc.?

24 A    Yes.  Yes.  Mr. Chen asked me for help until he was able

25 to get his own, yes.

Zhou - cross - Schweitzer                    206

1    Q    Your name is the only one that appears on the liquor

2    license, correct?

3    A    Yes.

4    Q    And this liquor license expired in October of 2019,

5    correct?

6    A    Yes.  Correct, yes.

7    Q    And it was renewed by Queens Community Board 6 on October

8    10, 2019, correct?

9    A    I think so.

10   Q    Why do you think so?

11   A    I don't really know.  That's what you said.

12   Q    Did you make an application to the Queens board for

13   renewal?

14   A    Well, the matter was handled by an agency or a company.

15   I never actually done the thing personally.

16   Q    Did you engage that agency or company?

17   A    This company?  Well, I was aware or knew about that

18   company.

19   Q    Did you engage that company to apply for the liquor

20   license?

21   A    Yes.

22   Q    So up to today, has Mr. Chen been able to get a liquor

23   license in his own name?

24   A    Probably no, not yet.  I don't think so.

25                (Continued on next page.)

CMH        OCR        RMR        CRR        FCRR

1    ("Larry" Dian Cai Zhou, the witness, resumed,

2    through the interpreter Arthur Kwok.)

3    CROSS-EXAMINATION

4    BY MR. SCHWEITZER:

5    Q    As the liquor license holder for Japanese Buffet

6    Restaurant, Inc., did you make the promise to make sure

7    alcohol wouldn't be sold illegally or improperly?

8    A    Well, I did -- I told him about it.

9    Q    When you say, "him," you're referring to Mr. Chen?

10   A    Yes.

11   Q    Did you delegate to Mr. Chen the responsibilities that

12   the liquor license principal would have?

13   A    I'm not sure I understand your question.

14        THE COURT:  Read it back.

15        (Requested portion read back.)

16   A    Yes.

17   BY MR. SCHWEITZER:

18   Q    And you couldn't delegate a power that you didn't have,

19   correct?

20        MR. MOREL:  Objection.

21        THE COURT:  Overruled.

22   A    Well, what I did -- all I did was lend him the liquor

23   license.

24   BY MR. SCHWEITZER:

25   Q    What are the responsibilities of a liquor license

Zhou - Cross - Schweitzer                    208

1   principal?

2           MR. MOREL:  Objection.

3           THE COURT:  Overruled.

4   A    Cannot sell liquor to anybody under 21, no sale to

5   pregnant women, that's it.

6   BY MR. SCHWEITZER:

7   Q    That's it?  Okay.

8           Did you also have a liquor license in your name on

9   behalf of Sunrise Japanese Food Inc., your wife's company?

10  A    Yes.

11  Q    And you also had a liquor license in your name for

12  Cherry Blossom Buffet, Inc., correct?

13  A    I lent it to Lin Yong until he got his license -- yeah,

14  liquor license, and he already got it.

15  Q    So is this a is liquor license you held for

16  Cherry Blossom Buffet, Inc.?

17  A    Yes.

18  Q    And that liquor license expired in October 2017,

19  correct?

20  A    Yes.

21  Q    You held that liquor license until then?

22  A    Until he got his license, because you're only allowed

23  one license for each location at a time.

24  Q    I'm showing you the second page of the document.  This

25  is the liquor license for Sunrise, right?

1              THE COURT:  Is this document in evidence,
2    Counselor?
3              MR. SCHWEITZER:  Not yet.
4              THE COURT:  All right.  You are questioning --
5              MR. SCHWEITZER:  I going to --
6              THE COURT:  You are questioning him about it.  Why
7    don't you identify it and see if there is any objection?
8              MR. SCHWEITZER:  So this document is two pages
9    that consists of two liquor licenses.  It's identified as
10   Exhibit 12.
11             THE COURT:  All right.  Is there any objection to
12   Exhibit 12?
13             MR. MOREL:  No objection.
14             THE COURT:  It's admitted.
15             (Plaintiffs' Exhibit Number 12 so marked and
16   received in evidence.)
17             MR. SCHWEITZER:  Okay.
18             (Plaintiffs' Exhibit Number 12 is published in
19   open court.)
20   BY MR. SCHWEITZER:
21   Q    And is the second page the Sunrise license?
22   A    Yes.  This was during the time period my wife was
23   operating it.
24   Q    And while your wife was operating the Fuji Japanese --
25   I'm sorry -- was operating Toma Japanese Cuisine, who

1    exercised the duties and responsibilities of the liquor

2    license principal?

3    A    A manager.

4    Q    Was that your wife or somebody else?

5    A    Well, it -- well, including her, including my wife, she

6    has to be responsible.

7    Q    Okay.

8         Now, you continued to work at Tomo Cuisine while

9    it was being operated by your wife, correct?

10   A    At that time I was not.  I don't think I can at that

11   time.

12   Q    Were you present on the premises?

13   A    Only if she asked me for help, and also when I'm free.

14   Q    And when your wife asked you for help making sure the

15   business was running, you helped?

16   A    Yes.

17   Q    What sort of things would you do?

18   A    Everything.  I did everything.

19   Q    Again, I'm just a lawyer.  I don't know what

20   everything --

21        THE COURT:  Please.  We don't need that speech.

22        Just ask your question.

23   BY MR. SCHWEITZER:

24   Q    What does "everything" mean?

25   A    Well, sometimes I helped the kitchen to buy some

1   material.  Sometimes I subbed for the sushi chefs in their

2   absence, and that kind of thing.

3   Q    And substituting for sushi chefs when they're absent,

4   in your mind, that doesn't count as work?

5   A    I didn't get paid.

6   Q    So labor performed for free isn't work?

7   A    I feel that it's dissimilar.

8   Q    Does that mean that a transfer of a business for free

9   isn't a real transfer?

10  A    Well, in fact, I did give the restaurant to my wife.

11  I'm not sure how that relates to work.

12  Q    And you continued to work at Tomo Cuisine when it was

13  under Cherry Blossom, too, didn't you?

14  A    At that the period, I did.  I came over and worked,

15  yes.

16  Q    Okay.  And when the restaurant was under

17  Cherry Blossom, did you exercise responsibilities of the

18  liquor license principal?

19  A    I suppose you can say that.

20  Q    Why can I that?

21  A    Huh?

22  Q    Why can I say that?

23  A    Because I was in there.

24  Q    When you were there from time to time when Tomo Cuisine

25  was under Sunrise, you did not exercise liquor

1  responsibilities, right?

2  A    That's right.  During that period of time I was busy

3  with myself, doing my own thing.  I was out of the country

4  most of the time, as well as busy finding new inspiration

5  and new things to do.  So I was not at Sunrise that much at

6  all.

7  Q    You said that your being out of the country for long

8  periods of time was one of the reasons that your wife gave

9  up on the Tomo Restaurant, right?

10                MR. MOREL:  Objection.  That's --

11                THE COURT:  Overruled.

12  A    I suppose that is one of the reasons, because during

13  those few years, I was not in the states that much.

14  BY MR. SCHWEITZER:

15  Q    And would you say that your presence was necessary for

16  your wife to keep operating both Tomo restaurants, rather

17  than just one?

18  A    The main reason, I'm not sure.  I don't think so.

19  Q    So it wasn't the main reason, but was it a contributing

20  reason?

21  A    I think so.

22  Q    Isn't it true that your wife would run decisions about

23  whether to terminate her employees by you?

24  A    No.

25  Q    At your deposition in March of 2019, do you recall

Zhou - Cross - Schweitzer                    213

1   being asked the following question and giving the following

2   answer?

3             MR. SCHWEITZER:  Page 72, Line 6.

4             THE COURT:  Through?

5             MR. SCHWEITZER:  Through Line 9.

6   BY MR. SCHWEITZER:

7   Q    Question:  Did she, that is your wife, ever run a

8   decision whether to discipline an employee or to terminate

9   an employee by you?

10            Answer:  Possibly, yes.

11            THE COURT:  Were you asked that question and did

12  you give that answer?

13            THE WITNESS:  Yes.

14            THE COURT:  Okay.

15            Well, it is 5:30.  We are going to continue with

16  the cross-examination of this witness at 10:00 a.m.

17            Do not talk about your testimony.  And we are

18  adjourned for the day.

19            Thank you?

20            THE COURTROOM DEPUTY:  All rise.

21            (Matter adjourned to Wednesday, July 21, 2021 at

22  10:00 a.m.)

23                    --oo0oo--

24

25

I N D E X                                          214

1                          *I   N   D   E   X*

2

3                    *W   I   T   N   E   S   S   E   S*

4

5            J I A N   H U I   "D A N N Y"   L I N

6

7   DIRECT EXAMINATION
    BY MR. SCHWEITZER:                             122

8   CROSS-EXAMINATION
    BY MR. MOREL                                   145

9

10        "L A R R Y"   D I A N   C A I   Z H O U

11

12  DIRECT EXAMINATION
    BY MR. MOREL                                   172

13
    CROSS-EXAMINATION
14  BY MR. SCHWEITZER                              193

15

16

17                      *E X H I B I T S*

18

19  Defendants' Exhibit F                          181

20  Plaintiffs' Exhibit Number 12                  209

21
    Plaintiffs' Exhibit 10                         200
22                                                 203
    Plaintiffs' Exhibit 8
23                                                 203
    Plaintiffs' Exhibit 7
24                                                 204
    Plaintiffs' Exhibit 1
25